## S96A1508. JORDAN v. THE STATE.
### (480 SE2d 18)

THOMPSON, Justice.

James Randall Jordan was convicted by a jury of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.[1] The felony murder was merged into the malice murder conviction, and sentence was imposed on all other counts. Jordan appeals from the judgment of conviction and sentences entered thereon, asserting primarily that the trial court erred in admitting into evidence a custodial statement taken after he had invoked his right to counsel, and in refusing to allow Loretta Leyva to assert a marital privilege on the basis of a common-law marriage. Finding no reversible error, we affirm the convictions for malice murder and possession of a firearm. But because there was no evidence of an independent aggravated assault, we conclude that the aggravated assault merged into the malice murder conviction as a matter of fact. Accordingly, we reverse the judgment of conviction and sentence for aggravated assault.

Jordan does not dispute that he shot and killed his next-door neighbor and long-time friend, Jason Underwood, but claims that the shooting was accidental. Jordan initially reported to police that he heard arguing at Underwood's residence, followed by a gunshot, and that he ran over there to find the victim lying in a pool of blood on the patio. The investigating officers discovered Underwood's body as described by Jordan. Jordan subsequently admitted shooting Underwood with a semi-automatic assault rifle, but claimed that the weapon discharged accidentally. He informed the officers that he had hidden the rifle and gun clip at various locations in his home, and he

---

[1] The crimes occurred on March 27, 1994. Jordan was charged on June 17, 1994 in a four-count indictment with malice murder, felony murder with the underlying felony being aggravated assault, aggravated assault and possession of a firearm during the commission of a felony. Trial commenced on November 21, 1994, and he was found guilty of all of the charged offenses on November 23, 1994. He was sentenced on the same day to life imprisonment for malice murder, twenty years for aggravated assault to run concurrently, and five consecutive years for the firearm possession conviction. A motion for new trial was filed on December 16, 1994, amended on October 20, 1995, and denied on January 9, 1996. The case was docketed in this Court on June 13, 1996, and oral argument was heard on October 15, 1996.

gave his consent to search the residence. The items were found in the locations he described. The cause of death was a bullet fired at a range of six to ten inches through the victim's mouth. A firearms examiner with the State Crime Lab testified that the rifle was in good working order; and that it "will not fire accidently . . . [but] only when the trigger is pulled rearward," requiring three pounds of pressure to the trigger. Jordan's girl friend, Loretta Leyva, testified he admitted to her that he deliberately shot Underwood because Underwood "kept ragging him." While in the presence of another friend, Jordan threatened to kill Leyva if she revealed this admission.

1. A *Jackson v. Denno* hearing was held prior to trial to determine the admissibility of Jordan's custodial statements. The evidence adduced at that hearing showed the following: After Jordan reported his initial account of the crime to police, he was asked to give a statement to a stenographer at the police station in connection with the investigation. He was considered a witness to the events, and was not then a suspect. He first informed the stenographer that he had been at Underwood's house earlier that day, but returned home for dinner. After dinner he heard hollering outside accompanied by a gunshot, at which time he went to investigate and found Underwood's body. He further stated: "I grabbed his hand and I shook him and I was calling his name and he didn't answer . . . and then I ran back to my house and my mama called the police. . . . I ran out to the street to flag in the officers." The stenographer's report continues: "At this time Mr. Jordan became nervous, became very nervous and said fuck it, I might as well tell you the truth. It was an accident. I shot him. It was an accident." The stenographer immediately stopped the interview and summoned the investigating officers. A detective arrived and advised Jordan of his *Miranda* rights. Jordan told that detective that he "wanted to tell the truth," and "thought he might need a lawyer," but he continued to volunteer that the shooting had been accidental, and that he wanted to cooperate with the officers. Jordan was taken to another interrogation room where he reiterated, without further questioning, that the shooting was an accident and that he wanted to cooperate with the investigating officers. A second detective entered the room, re-administered *Miranda* warnings, explained their content, obtained a signed waiver of rights form, and proceeded to interrogate the defendant. During this interview, Jordan explained his conduct in further detail, while continuing to maintain that the shooting was accidental. He disclosed that earlier in the day he had taken his SKS semi-automatic assault rifle to Underwood's house. Underwood had a .357 revolver in his waistband. Jordan continued: "I set my rifle on the wall and Jason was playing with me . . . slapped me on the back of my neck once or twice, we

was [sic] just playing and I moved and Jason grabbed my rifle by the barrel . . . and I grabbed the rifle between the clip and trigger guard and I guess my finger slipped in the trigger and when I was pulling the rifle back, it discharged." He then ran home, told his mother that he had accidentally shot Underwood, and she telephoned for help.

The trial court determined that Jordan's mention of a lawyer did not constitute a clear invocation of the right to counsel, and that his subsequent statements to police were freely, voluntarily, and intelligently made and would be admissible at trial.

Jordan asserts that his statement, that he "might need a lawyer" is an unambiguous assertion of the right to counsel which required the cessation of questioning, and that any statements which followed were inadmissible because they were derived in violation of the right to counsel and the prohibition against compelled self-incrimination.[2]

Law enforcement officers must immediately cease questioning a suspect who has *clearly* asserted a right to have counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). In *Davis v. United States*, 512 U. S. ___ (114 SC 2350, 129 LE2d 362) (1994), the court explained the substance of a clear and unambiguous request:

> Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." [Cit.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning. [Cits.]
>
> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." [Cit.] . . . [A suspect] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

Id., 114 SC at 2355. Davis' statement, "Maybe I should talk to a lawyer," did not communicate an unambiguous request for counsel. Neither was Jordan's reference to an attorney a clear invocation of his right to counsel as would require the cessation of questioning under *Edwards v. Arizona*. See also *Luallen v. State*, 266 Ga. 174 (4)

---

[2] Jordan asserts these claims only under the United States Constitution.

(465 SE2d 672) (1996); *Henry v. State,* 265 Ga. 732 (4) (b) (462 SE2d 737) (1995); *Baird v. State,* 263 Ga. 868 (1) (440 SE2d 190) (1994).

Even if Jordan's request were unambiguous, his claim fails for another reason. His responses to subsequent questions would be admissible if he initiated further discussions with police and he knowingly and intelligently waived the right he had invoked. *Edwards v. Arizona,* supra, 451 U. S. at 484. Both before and after his reference to counsel, Jordan continued to volunteer that he shot the victim and that he wanted to cooperate. *Miranda* warnings were administered for the second time, were carefully explained to him, and a written waiver was given. The record shows that he repeatedly initiated conversation with the investigating officers and that he knowingly and intelligently waived any right to counsel he may have previously invoked. See *Crowe v. State,* 265 Ga. 582 (5) (458 SE2d 799) (1995).

In the alternative, Jordan asserts that his reference to counsel is at least an ambiguous or equivocal request which mandates clarification before any interrogation may continue. That issue was squarely addressed in *Davis,* contrary to Jordan's position.

> [A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. . . . [W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.

*Davis v. United States,* supra, 114 SC at 2356.[3] Thus, clarification of Jordan's ambiguous request was not required under the federal constitution. But even if it were, by administering *Miranda* warnings for the second time after the reference to counsel, carefully reviewing the waiver of rights form, and obtaining Jordan's signature thereto, the officers resolved any possible ambiguity that may have been created by his previous statement. See *Luallen v. State,* 266 Ga., supra.

*Hall v. State,* 255 Ga. 267 (336 SE2d 812) (1985), does not require a different result. *Hall* was decided long before *Davis* clarified the varying approaches of the lower courts with respect to ambiguous references to counsel during custodial interrogation. Indeed, this Court in *Hall* exhaustively discussed the then-present conflict in authority and opted to follow the approach taken in *Nash v. Estelle,* 597 F2d 513 (5th Cir. 1979) (en banc), requiring that after

---

[3] See also Equivocal Requests for an Attorney: Caveat Emptor Comes to the Fifth Amendment, 45 Emory L.J. 673 (1996).

an ambiguous request for counsel, the scope of any further interrogation should be narrowed to an attempt to clarify the nature of the request. Because Jordan has only claimed a violation of his federal constitutional rights, we are bound by the Supreme Court's decision in *Davis v. United States*, holding that the police have no duty to clarify an ambiguous and equivocal assertion of the right to counsel.[4]

2. Jordan contends the trial court erred in finding the absence of a common-law marriage between himself and Loretta Leyva, thereby refusing to allow Leyva to invoke the marital privilege under OCGA § 24-9-23.[5] We disagree.

"The decision of the trial court as to the fact question of the existence vel non of a common-law marriage, should not be disturbed on appeal if there is any evidence to support its finding." *Conyers v. State*, 249 Ga. 438, 441 (291 SE2d 709) (1982). Leyva testified that she had recently told her brother that she was "too young" and "not ready to be married"; that she had publicly denied the existence of the marriage on several occasions when she was angry; that she indicated her marital status to be "single" when filling out welfare applications; that the name given on her daughter's birth certificate is Leyva, not Jordan; and that when visiting Jordan in prison she signed the visitor's list as his "fiancee." Finally, when the court asked Leyva directly whether she was Jordan's fiancee, she replied, "I don't know what I am, to tell you the truth." Thus, there was substantial evidence to support the trial court's conclusion that no common-law marriage existed.

3. At a hearing outside the presence of the jury, the state established that it had provided notice under Uniform Superior Court Rule 31.3 (B) of its intent to introduce evidence of similar transactions, consisting of the testimony of various named individuals that Jordan had on several specified occasions pointed firearms at others. The evidence was offered to show course of conduct. The sole objection was that the notice was insufficient because it contained an incorrect indictment number. The trial court correctly determined that the typographical error did not render the evidence inadmissible. The spirit of USCR 31.3 was satisfied; Jordan was provided with fair and adequate notice of the State's intent and a meaningful opportunity to rebut that evidence and to resolve questions regarding

[4] The *Davis* Court also observed that "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] wants an attorney." *Davis v. United States*, supra, 114 SC at 2356. While greater protections may be afforded citizens under the Georgia Constitution, this issue is not now before the court.

[5] We note that effective January 1, 1997, "No common-law marriage shall be entered into in this state . . . . Otherwise valid common-law marriages entered into prior to January 1, 1997, shall not be affected . . . and shall continue to be recognized in this state." OCGA § 19-3-1.1 (Ga. L. 1996, p. 1414, § 1).

its admissibility prior to trial. See generally *Wilkins v. State*, 266 Ga. 278 (3) (a) (466 SE2d 592) (1996); *Matula v. State*, 264 Ga. 673 (3) (449 SE2d 850) (1994); *Maxwell v. State*, 262 Ga. 73 (2) (a) (414 SE2d 470) (1992).

4. Jordan contends that the trial court impermissibly placed his character in issue by allowing the State to inquire into his tendency for violence, in violation of OCGA § 24-9-20 (b). But Jordan opened the door to this line of questioning during cross-examination of Leyva when his counsel asked and obtained affirmative responses to questions concerning frequent physical fights between Jordan and Underwood, and between Leyva and Jordan. On re-direct, the prosecutor merely followed up on the issues injected by Jordan by asking Leyva whether Jordan is violent. She was permitted to respond, over objection, that he frequently hit her with his fists and hands. Because Jordan elected to initiate the issue of his propensity for violence, the prosecution was authorized to further explore that area. OCGA § 24-9-20 (b); *Mulkey v. State*, 250 Ga. 444 (3) (298 SE2d 487) (1983); *Smith v. State*, 258 Ga. 181 (1) (366 SE2d 763) (1988).

5. The sole shot that was fired was the one which caused the death of the victim.

> [A]pplying the "actual evidence" test of our substantive double jeopardy provisions, see OCGA §§ 16-1-7 (a), 16-1-6, we find that [appellant's] conviction for [aggravated assault of the deceased victim] must be set aside. The "actual evidence" test, in effect, means " 'that if the state uses up all the evidence that the defendant committed one crime in establishing another crime, the former crime is included in the latter as a matter of fact under . . . OCGA § 16-1-6 (1).' "

(Citations omitted.) *Montes v. State*, 262 Ga. 473, 474 (1) (421 SE2d 710) (1992). An independent aggravated assault is committed *only if* supported by evidence which was not used to prove the murder itself. *Lowe v. State*, 267 Ga. 180 (476 SE2d 583) (1996). Since the evidence does not support a conviction for aggravated assault which is independent of the act which caused Underwood's death, the conviction and sentence for the aggravated assault of Underwood must be set aside. *Montes*, supra. Compare *Drane v. State*, 265 Ga. 255, 260 (9) (455 SE2d 27) (1995).

6. The evidence was sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), to find Jordan guilty of malice murder and possession of a firearm in the commission of a crime.

7. Jordan failed to preserve his remaining enumerations of error by not making timely objections at trial. See *Prince v. State*, 257 Ga.

84 (7) (355 SE2d 424) (1987).
*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED JANUARY 21, 1997.

*Johnson, Prioleau & Lynch, Theodore Johnson,* for appellant.
*Lewis R. Slaton, District Attorney, Juliette W. Scales, Assistant District Attorney, Michael J. Bowers, Attorney General, Wesley S. Horney, Assistant Attorney General,* for appellee.