S07P0151. RIVERA v. THE STATE.
(647 SE2d 70)

THOMPSON, Justice.

A jury convicted Reinaldo Javier Rivera of one count of malice murder, three counts of rape, four counts of aggravated sodomy, four counts of aggravated assault, one count of burglary, and one count of possession of a knife during the commission of a crime in connection with the rape and murder of Marni Glista and the rapes of Chrisilee

---

[13] *Smith v. State*, 280 Ga. 490, 492 (1) (629 SE2d 816) (2006); *Shelton v. State*, 279 Ga. 161, 162 (3) (611 SE2d 11) (2005).

Barton and Tabitha Bosdell.[1] Rivera was sentenced to death for the murder. The trial court denied Rivera's motion for new trial, and he appeals. Finding no reversible error, we affirm the convictions and sentences.

## General Grounds

1. Construed to support the verdicts, the evidence showed that on the morning of October 10, 2000, under the pretext of seeking directions, Rivera detained 18-year-old Chrisilee Barton while her car was at a stop sign. When the drivers behind her became impatient and honked their car horns, Rivera suggested that they pull into a nearby parking lot, where he continued to engage Barton in conversation, eventually telling her he was a professional photographer and asking her about modeling for photographs. When Rivera could not produce any identification to verify that he was with a modeling agency as he represented himself to be, Barton tried to put him off. However, Rivera was insistent about taking photographs of her at that time so Barton suggested that he follow her to her stepfather's apartment. Although Barton tried to lose Rivera along the way by switching in and out of lanes, Rivera arrived at the apartment immediately behind her, parked his car right beside hers, and followed her inside. While she was in the bathroom, Rivera secured a kitchen knife with which he attacked Barton from behind, raping and sodomizing her while she went in and out of consciousness. Rivera then strangled Barton and, supposing she was dead, left her unconscious on the floor. Rivera exited the apartment, moved his car down the street, and returned on foot to be certain he had left no incriminating evidence behind. When Rivera reentered the apartment and realized Barton was still alive, he again tried to kill her by strangling

---

[1] The rape and strangulation of Glista occurred on September 4, 2000, resulting in her death on September 9, 2000. The rape of Bosdell occurred on June 29, 2000, and the rape of Barton on October 10, 2000. Rivera was indicted October 24, 2000, on these charges by a Richmond County grand jury. (The record shows that Rivera was indicted for the June 29, 2000 murder of Bosdell in Columbia County, where her remains were discovered. See OCGA § 17-2-2 (c).) The State filed written notice of its intent to seek the death penalty on October 25, 2000, which it amended on January 23, 2004. Rivera's trial began on January 5, 2004, and the jury convicted him on all counts. The jury recommended a death sentence for the murder on January 26, 2004. In addition to the death sentence, the trial court imposed the following sentences to be served consecutively to the death sentence and to each other: life sentences for each of three counts of rape and for each of four counts of aggravated sodomy; twenty-year sentences for each of four counts of aggravated assault and one count of burglary with intent to commit a felony (murder); and a five-year sentence for possession of a knife during the commission of a crime (aggravated assault). Rivera filed a motion for new trial on February 19, 2004, which he subsequently amended on January 9, 2006. The amended motion was denied on July 11, 2006. Rivera filed a notice of appeal on July 25, 2006. This appeal was docketed on September 22, 2006, and orally argued on February 28, 2007.

her with a towel before obtaining another knife from the kitchen and stabbing her repeatedly in the neck, transecting her jugular vein. Barton eventually regained consciousness and, despite multiple, deep stab wounds to her neck resulting in permanent nerve injury, she was able to crawl to the telephone and call 911. When the police arrived, the deadbolt on the door to the apartment where Barton was located was locked from the inside, and it appeared Rivera had exited through a back window.

Upon hearing a description of Barton's attacker on a news report, both Rivera's co-worker and his sister-in-law reported to police that they believed Rivera was the perpetrator. Rivera was eventually located in a South Carolina motel room and transported to the hospital because of an apparent suicide attempt. During interviews with police, Rivera not only admitted to the assault on Barton but confessed to raping, sodomizing, and murdering Marni Glista in September 2000 and to raping, sodomizing, and murdering Tabitha Bosdell in June 2000. Rivera disclosed the location of Bosdell's remains in Columbia County and also revealed that there were two other murder victims in South Carolina.

Marni Glista's commanding officer realized that Glista, a 21-year-old sergeant in the Army at the time of her death, had not reported for duty when her husband called from Kuwait trying to get in touch with her on the morning of September 5, 2000. He and another Army officer went to her residence, where they found her husband's vehicle in the driveway, with the windows down and bags of groceries on the front passenger seat. A police officer later testified that inside the bags he found a cell phone, a wallet containing a $20 bill, and the store receipt showing that the groceries had been purchased at 11:12 a.m. the previous day.

Although lights and ceiling fans were on inside Glista's residence, the Army officers could get no one to the front door so they called the police, who entered the residence and discovered Glista in a bedroom lying prone on the floor at the foot of the bed, nude except for an unfastened bra on her shoulders. She was making a gurgling sound, and one finger was moving. Glista's neck and wrists were "very neatly" wrapped with white medical tape, and her wrists were also bound together by tape with about an inch of space between them. There were severe abrasions equivalent to second-degree burns on her wrists, where it appeared that she had struggled against the tape over an extended period of time, and she had injuries consistent with a ligature having been applied to her neck. There were indentation marks on her back from bed rails she had been lying against, and she suffered bruising on her chest, her knees, and her pelvic area, in addition to numerous scratches and abrasions over her

body. Glista's treating physician testified that Glista suffered irreversible brain damage as a result of an hypoxic injury caused by a lack of blood flow and oxygen to the brain and that, as a result, Glista's brain swelled until it cut off her breathing, at which point she was placed on a ventilator. On September 8, 2000, Glista was declared to be brain dead, and she died the following day when she was removed from the ventilator. The medical examiner testified that Glista suffered injuries consistent with having been sexually assaulted and that the cause of her death was the delayed consequence of ligature strangulation.

Months before, on the afternoon of June 29, 2000, Rivera saw 17-year-old Tabitha Bosdell walking to her job as a telemarketer in Augusta. After persuading her to get in the car with him, he took her to a secluded area where, during a fierce struggle, he sodomized, raped, and finally strangled her, first with his arm and then with her shirt. He subsequently disposed of her body in the woods at an exit off Interstate 20 and threw her clothing onto the side of the interstate. On October 14, 2000, investigators with the Richmond County and Columbia County Sheriff's Offices found human skeletal remains in a wooded area located in Columbia County off Interstate 20 by following directions provided to them by Rivera. The remains were identified as those of Bosdell through her dental records. A belly button ring and two white socks with a blue logo that were found in the area were also identified as belonging to Bosdell.

We conclude that the evidence, viewed in the light most favorable to the jury's verdict, was sufficient to authorize a rational trier of fact to find Rivera guilty of all charges beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See OCGA §§ 16-5-1, 16-6-1, 16-6-2, 16-5-21, 16-7-1, and 16-11-106.

## Guilt/Innocence Phase

2. Rivera contends that the trial court erred by not allowing expert testimony regarding a theory that there is a connection between frontal lobe dysfunction and criminality. However, the record shows that Rivera failed to raise an objection to the ruling in the trial court. Accordingly, Rivera may not raise this issue on appeal. *Tatum v. State*, 259 Ga. 284, 287 (4) (380 SE2d 253) (1989). Furthermore, we conclude that the trial court properly exercised its discretion in applying the *Harper* analysis and concluding, based on the evidence presented to it by the parties, including the testimony of the defense's experts and the most recent scientific articles at the time of trial pertaining to this area of study, that the theory in question had not

reached a scientific stage of verifiable certainty to be admissible in the trial of this case. See *Harper v. State*, 249 Ga. 519, 525-526 (1) (292 SE2d 389) (1982).

3. There was no abuse by the trial court in allowing to be presented to the jury the similar transaction evidence of the murder of Tabitha Bosdell and the rapes and murders of the two South Carolina victims, Melissa Dingess and Tiffany Wilson. After conducting a hearing in full compliance with the mandate of *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991), the trial court found that the State had satisfied its burden in showing the following: (1) that each of the similar transactions that it sought to introduce as evidence was perpetrated by defendant; (2) that a sufficient connection existed between the acts alleged in the indictment and the transactions proffered so that proof of one tends to prove the others; and (3) that each transaction was offered for appropriate purposes to show defendant's bent of mind and course of conduct. According to our review of the record, the trial court's finding was not clearly erroneous and, therefore, will not be disturbed on appeal. *Davis v. State*, 279 Ga. 786, 787 (3) (621 SE2d 446) (2005). We find no merit in Rivera's contention that the similar transaction evidence was overly prejudicial, as the trial court gave detailed limiting instructions each time it was admitted and at the close of the case. See *Farley v. State*, 265 Ga. 622, 625 (2) (458 SE2d 643) (1995) (similar transaction evidence determined to be relevant for a proper purpose should be admitted, and the prejudicial impact is a matter for jury instruction).

4. In his third and fourth enumerations of error, Rivera challenges the admission into evidence of audiotape recorded statements he made to police. Citing *Larry v. State*, 266 Ga. 284 (466 SE2d 850) (1996) for the proposition that the determination of whether a waiver of rights and a subsequent statement are knowing and voluntary depends on "the totality of the circumstances," Rivera maintains that the trial court erred in not finding involuntary and inadmissible his statements made while he was hospitalized for the treatment of injuries resulting from his suicide attempt, while he was under medication, and after he had invoked his right to counsel.

(a) The fact that a defendant is hospitalized, is undergoing treatment, is in pain, or is taking pain medication does not "in and of itself, render any statement made involuntary." *Larry*, supra at 286 (2) (b). Rivera indicated to his treating physician that he was willing to speak with the police and was cleared by her as being physically able and mentally capable of doing so. He was lucid, and his responses were appropriate. He read his *Miranda* rights aloud and indicated he understood each one, and he read and signed a waiver of counsel form. He was neither threatened nor coerced. The evidence supports the trial court's findings in favor of admissibility. See *Short v. State*, 256

Ga. 165, 167 (3) (345 SE2d 340) (1986) (unless clearly erroneous, trial court's findings regarding factual determinations and credibility relating to the admissibility of statements will be upheld on appeal).

(b) Rivera also contends that, because he invoked his right to counsel during his initial interview with the police on October 13, 2000, the trial court erred in admitting his subsequent statements. *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981) (accused who asks for counsel must initiate further communication with police in order to thereafter waive his previously invoked rights). At the *Jackson-Denno* hearing, the investigator's uncontradicted testimony was that, early in this interview, after signing a waiver of counsel form, Rivera "stated that he thought he might need a lawyer" when he learned that Barton had survived his attack on her. See *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964). Police then advised Rivera that they could no longer speak with him because he had invoked his right to counsel and that, in the event Rivera decided that he wanted to speak further with them, he would have to reinitiate contact with them. Rivera then requested to talk with his wife, stating that he would decide about speaking further with the police after speaking with her. The investigators arranged for Rivera to speak with his wife by telephone and then exited his room. Subsequently, they were informed by the deputy guarding Rivera that he wished to speak with them again.

Citing *Oregon v. Bradshaw*, 462 U. S. 1039, 1044 (103 SC 2830, 77 LE2d 405) (1983) (showing that accused reinitiated contact with police insufficient to meet the State's burden to show a valid waiver of previously invoked right to counsel), Rivera argues that the State failed to meet its burden of showing that, upon reinitiation of his contact with the police, he made a valid waiver of his previously invoked right to counsel. Pretermitting whether Rivera's statement during his initial October 13 interview constituted a sufficient invocation of the right to counsel to require the investigators to cease their questioning in the first place, see *Jordan v. State*, 267 Ga. 442, 443 (1) (480 SE2d 18) (1997) (defendant's statement that he " 'thought he might need a lawyer' " did not constitute clear invocation of his right to counsel as would require cessation of questioning under *Edwards*), the uncontroverted testimony adduced at both the *Jackson-Denno* hearing and at Rivera's trial established that Rivera reinitiated further communication with the police by asking the deputy guarding him to contact them on his behalf. When the police returned to Rivera's room, Rivera confirmed that he had sent for them and that he desired to reinitiate contact with them. The investigators re-read the *Miranda* rights to Rivera, Rivera himself read them aloud, and Rivera then re-signed a waiver of rights form. At no point did police make any promises to Rivera or attempt to coerce him in any way. We

find no merit in Rivera's contention that the investigators' accommodation of Rivera's request to speak to his wife in some way undermined the *Edwards* rule by prompting Rivera's request to reinitiate contact with the police. This is not the "slightest hope of benefit" that would render Rivera's statement involuntary and inadmissible. See *Arline v. State*, 264 Ga. 843, 844 (2) (452 SE2d 115) (1995) (the "slightest hope of benefit" in OCGA § 24-3-50 is construed to mean the hope of a lighter sentence). Moreover, it is not uncommon for a suspect in custody to be allowed to speak with a family member. See *Cook v. State*, 270 Ga. 820, 826 (2) (514 SE2d 657) (1999) ("Numerous cases hold that *Miranda* is not implicated when a suspect in custody is questioned or encouraged to confess by a father, mother, wife, or girl friend"). See also *Harvell v. State*, 275 Ga. 129 (562 SE2d 180) (2002) (accused's statement was admissible where his request to speak with his mother, made at the same time that he invoked his right to counsel, was accommodated by the police, his mother subsequently informed police that he wished to reinitiate contact, and accused signed waiver form witnessed by his mother). Because the record shows that Rivera reinitiated further communication with the investigating officers and that he made a knowing and intelligent waiver of any right to counsel he may have previously invoked, we find no error. See *Jordan*, supra at 445 (1).

5. Upon our review of the record, we conclude that the trial court did not abuse its discretion in limiting the scope of Rivera's cross-examination of his ex-wife concerning the apparent normalcy of the domestic life that she and Rivera shared. See *Johnson v. State*, 270 Ga. 234, 235 (2) (507 SE2d 737) (1998) (trial court has a broad discretion in determining scope of relevant cross-examination). Rivera's contention that he should have been allowed to pursue this line of questioning in order to develop mitigating evidence is without merit, because the evidence was irrelevant to the issues to be decided in the guilt/innocence phase. See *Lucas v. State*, 274 Ga. 640, 643 (2) (b) (555 SE2d 440) (2001) (holding that irrelevant evidence was improperly admitted during guilt/innocence phase of trial).

6. We find no reversible error due to a similar transaction victim's husband identifying a photograph of the victim in life since Rivera did not object and there was no emotional display. *Jones v. State*, 273 Ga. 231, 234 (4) (539 SE2d 154) (2000).

7. The trial court did not abuse its discretion by dismissing a juror who returned a half-hour late from a lunch recess. The trial court inquired into the reason for the juror's tardiness and, finding that she had an ongoing hardship arranging childcare, dismissed her and replaced her with an alternate juror. It is well established that OCGA § 15-12-172 gives a trial court the "discretion to discharge a juror and replace him or her with an alternate at any time so long as

the trial court has a sound legal basis." (Citations and punctuation omitted.) *Brooks v. State*, 281 Ga. 14, 18 (3) (635 SE2d 723) (2006) (juror's tardiness to court was a sound basis for her dismissal).

8. After the jury returned guilty verdicts on all counts of the indictment, Rivera requested to address the trial court. In response, the trial court engaged in a colloquy with Rivera and his counsel outside the presence of the jury in which Rivera inquired about several scenarios, including his presenting no mitigation evidence, his waiving his presence during the sentencing phase, and his acting as co-counsel to his attorneys. Rivera now argues on appeal that the trial court abused its discretion by sua sponte forcing upon him, without making any inquiry as to whether he was competent to control his defense, a form of hybrid representation in which he represented himself as co-counsel. See *Faretta v. California*, 422 U. S. 806, 835 (V) (95 SC 2525, 45 LE2d 562) (1975) (the trial court must apprise the defendant of the "dangers and disadvantages" inherent in representing himself "so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Cit.]"). See *Hance v. Kemp*, 258 Ga. 649, 650 (1) (373 SE2d 184) (1988) (while a defendant has the right to represent himself, he does not have the right to act as co-counsel although the trial court may allow him to do so).

A review of the transcript shows that once the trial court explained to Rivera that the sentencing phase had to go forward but that as a *defendant* he was in control of his defense, see *Morrison v. State*, 258 Ga. 683, 686 (3) (373 SE2d 506) (1988) ("Even if he is represented by an attorney, the attorney 'is still only an *assistant* to the defendant and not the master of the defense.' [Cit.]"), Rivera had no desire to represent himself, either alone or as co-counsel, but only wished to have his counsel represent his interests as he perceived them to be. See *Colwell v. State*, 273 Ga. 634, 639 (3) (b) (544 SE2d 120) (2001) (addressing defendant's right to control basic approach to his defense). While Rivera did inquire about the possibility of firing his attorneys during his dialogue with the trial court, the question was within the context of his differences with them regarding trial strategy. Rivera never asked the trial court to allow him to proceed pro se. See *Thaxton v. State*, 260 Ga. 141, 142 (2) (390 SE2d 841) (1990) (holding that a request to conduct one's trial pro se must be "unequivocal" and that "a defendant 'cannot frivolously change his mind in midstream' by asserting his right to self-representation in the middle of his trial. [Cit.]").

The record shows that Rivera testified during both the guilt/innocence phase and sentencing phase of his trial, during which he expressed his belief that he should be held accountable for his actions and, thus, that the jury should return a death sentence. He also directed some

of the actions of his counsel, among which were not allowing two of his family members to testify as mitigation witnesses. However, upon reviewing the trial transcript, we conclude that Rivera acted "merely as an involved client who wished to have his own views made known to the jury. By ensuring that counsel respected [Rivera's] wishes, the trial court did not transform counsel into *co*-counsel, rather, it ensured that counsel served as [*Rivera's*] counsel." *Colwell*, supra at 639 (3) (b). Because Rivera did not waive his constitutional right to representation, the trial court was not required to explain Rivera's rights to him or to make inquiries concerning his decision about his representation and whether that decision was freely and voluntarily made. See *Colwell*, supra at 638 (3) (b).

To the extent that Rivera contends that the trial court erred in not ensuring that he was competent to control his own defense, see *Lamar v. State*, 278 Ga. 150, 151 (1) (a) (598 SE2d 488) (2004) (it is a violation of constitutional law for a mentally incompetent person to stand trial, whether that person is represented by counsel or acting pro se), the record shows that the trial court ordered pretrial that Rivera undergo an evaluation pursuant to OCGA §§ 17-7-130.1 and 17-7-131, including a neurological examination and an MRI. The trial court heard the testimony of the neurologist who examined and interviewed Rivera and who opined during the guilt/innocence phase that Rivera was not mentally ill and that he was of above average or superior intelligence. Nothing before us indicates that Rivera was incompetent to stand trial nor is there anything in the record that should have indicated to the trial court that a sua sponte inquiry into competency was required. See *Mize v. State*, 269 Ga. 646 (501 SE2d 219) (1998) (no error where the defendant informed the trial court after the jury reached a guilty verdict that, against his counsel's advice, he had forbidden his lawyers from presenting a mitigation case and that he should receive a death sentence, where the trial court, before trial proceeded, conducted a mental evaluation and a competency hearing which found the defendant competent); *Morrison v. State*, 258 Ga. 683 (373 SE2d 506) (1988) (a competent defendant, after being properly informed by his attorney, makes the ultimate decision about what line of defense to pursue and about whether to testify in his own behalf, to plead guilty, and to present mitigation witnesses).

9. We find no merit to Rivera's contention that in light of *Francis v. Franklin*, 471 U.S. 307 (105 SC 1965, 85 LE2d 344) (1985), the trial court's jury instruction regarding intent and presumption of sound mind was unconstitutionally burden shifting. This Court has previously considered essentially the same charge as that given by the trial court and has found it distinguishable from the mandatory rebuttable presumption held unconstitutional in *Francis*, supra at 325 (II)

(B). *Flynn v. State*, 255 Ga. 415, 416 (2) (b) (339 SE2d 259) (1986). See also *Parker v. State*, 256 Ga. 363, 365 (1) (349 SE2d 379) (1986) (charging a rebuttable presumption of sanity does not impermissibly shift the burden of proof to the defendant, because "Georgia law presumes sanity" and insanity is an affirmative defense). Moreover, the trial court's charge is taken directly from the pattern jury instructions and is a correct statement of the law. See Council of Superior Court Judges, Suggested Pattern Jury Instructions, Third Ed., Vol. II, p. 34, § 1.41.12 (2004).

### Sentencing Phase

10. (a) The prosecutor argued before the jury a scenario presenting Rivera's future dangerousness to a young female prison nurse. "Arguments addressing [future dangerousness] are not improper if based on evidence adduced at trial." *Ross v. State*, 254 Ga. 22, 34 (7) (326 SE2d 194) (1985), overruled on other grounds, *O'Kelley v. State*, 278 Ga. 564 (604 SE2d 509) (2004). During the sentencing phase, Rivera testified as follows:

> [M]y ultimate purpose is to ask the jury to impose the penalty of death so that I never have the slightest chance, the slightest chance of ever being free again, because I couldn't stop before and I still can't stop. I just still fantasize about, about hurting people. I fantasize about, I fantasize about still hurting the same girls that I killed. That's how disturbing it is. I have fantasies about still killing them, not killing them, but still doing things to them. It doesn't stop.

Having already been convicted of murder, Rivera faced at a minimum a life sentence. Thus, the only women he would have the opportunity to attack would be those with whom he came in contact within the prison system. Furthermore, there was testimony in the record that Rivera had been involved in several physical fights while in jail, showing that the structure of incarceration had not suppressed his propensity for violence. Therefore, the State's argument that he would prove a danger to a female employee of the prison system was narrowly tailored to and logically based on the evidence before the jury. Compare *Henry v. State*, 278 Ga. 617, 619-620 (1) (604 SE2d 826) (2004) (improper for the State to argue that a defendant will kill in prison simply because he killed while free). Under the circumstances, the trial court did not abuse its discretion in not granting Rivera's motion for a mistrial nor his request for curative instructions. *Davis v. State*, 262 Ga. 692, 693 (2) (424 SE2d 628) (1993).

(b) Rivera also contends that the trial court erred in allowing the prosecutor to close with the rhetorical question, "Whose daughter will it be the next time?" This argument was a logical inference from Rivera's own testimony that he could not stop attacking young women in the same manner in which he had hurt and killed the victims and was clearly based on the evidence. Furthermore, Rivera failed to object to this portion of the argument at trial. Therefore, even if the prosecutor's argument had been improper, there would be no reversible error unless there is a reasonable probability that it changed the result of trial. *Mullins v. State*, 270 Ga. 450-451 (2) (511 SE2d 165) (1999) (the "reasonable probability" test applies only in the limited context of this Court's appellate review of a capital case). We find that it did not.

11. Rivera's contention that the trial court denied him an opportunity to argue in the sentencing phase the effectiveness of the death penalty as a general deterrent is without merit. During his general deterrence argument, Rivera's counsel rhetorically asked, "Can you find a scientist, a sociologist, anybody that's studied the subject [of the death penalty as a deterrent] and said it's been effective in any way?" However, no expert studies that the death penalty is ineffective as a general deterrent were in evidence, see *Blige v. State*, 263 Ga. 244, 245 (2) (430 SE2d 761) (1993) ("It is a basic tenet of trial procedure that counsel cannot argue facts not in evidence. [Cit.]"), as it is well established that the introduction of outside evidence on the deterrent effect of the death penalty by either party is prohibited. *McClain v. State*, 267 Ga. 378, 386 (4) (b) (477 SE2d 814) (1996) (citing *Fleming v. State*, 265 Ga. 541 (458 SE2d 638) (1995)). Furthermore, Rivera waived his right to appeal this issue by voluntarily abandoning this line of argument before the trial court ruled on the State's objection. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

12. During sentencing phase deliberations, the trial court received a written communication from the jury inquiring whether the jurors could retire for the evening and continue deliberations the following day. During a colloquy with counsel, the trial court asked if there were any objections to its intention of responding to the jury's request by writing "NO!" on the jury's communication. Rivera's counsel requested that the trial court be less emphatic in its response, which request the trial court refused. However, Rivera's counsel made no objection to the trial court's instruction to the jury to continue its deliberations so that issue is waived on appeal. *Earnest*, supra.

In any event, considering the totality of the circumstances, we conclude that the verdict was not coerced by the trial court. *Sears v. State*, 270 Ga. 834, 837 (1) (514 SE2d 426) (1999) (whether a verdict was coerced by the trial court depends upon the totality of the

circumstances). The record shows that, allowing for a lunch break, the jury had been deliberating for approximately five hours when the request to stop deliberations for the day was made at 5:47 p.m. and that the jury deliberated for less than eight hours before reaching a verdict at 8:26 p.m. The jury did not communicate to the trial court that it was deadlocked or that it was facing any other problem as a result of continued deliberation. See *Sears*, supra at 837 (1) (verdict not coerced where jurors deliberated for more than fourteen hours over a period of three days, twice informed trial court they were deadlocked, and were given modified *Allen* charge before reaching their verdict). Upon announcement of the verdict, the jury was polled, and each of the jurors stood by the verdict, announcing that they rendered it freely and voluntarily in the jury room and that it was still their verdict. See *Rouse v. State*, 265 Ga. 32, 34 (3) (453 SE2d 30) (1995).

### Sentence Review

13. We find that the death sentence in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1).

14. The jury recommended a death sentence for the murder conviction based on the following statutory aggravating circumstances: the murder was committed while defendant was engaged in the commission of another capital felony, to wit: rape, OCGA § 17-10-30 (b) (2); the murder was committed while defendant was engaged in an aggravated battery, id.; and the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim prior to the victim's death, OCGA § 17-10-30 (b) (7). Viewed in the light most favorable to the State, the evidence was sufficient to authorize the jury to find these statutory aggravating circumstances beyond a reasonable doubt. *Jackson*, supra, 443 U. S. at 307; OCGA § 17-10-35 (c) (2). See Division 1, supra.

However, the jury returned a disjunctive finding of "torture, depravity of mind, *or* an aggravated battery to the victim," whereas "this finding should have been returned in the conjunctive to ensure unanimity concerning the necessary elements of the § [17-10-30] (b) (7) circumstances. [Cit.]" (Emphasis supplied.) *Hill v. State*, 263 Ga. 37, 46 (22) (427 SE2d 770) (1993). Nevertheless, no reversal is required because the death sentence remains based on other valid statutory aggravating circumstances. *Jenkins v. State*, 269 Ga. 282, 294 (23) (a) (498 SE2d 502) (1998); *Wilson v. State*, 250 Ga. 630, 638 (9) (300 SE2d 640) (1983).

15. The jury was authorized to find that Rivera followed Marni Glista from the grocery store into her home, overpowered her, bound her neck and wrists with medical tape, raped her, sodomized her, and strangled her with her bathrobe. Rivera testified that, although "[he] knew Marni was still alive . . . [and] could see her heart beating very quickly," he left her bound and helpless until she was discovered almost 24 hours later. According to Rivera's audiotaped confession, after raping and sodomizing Chrisilee Barton, he strangled her with the intention of killing her and, finding her still alive when he returned to the apartment, strangled her again before stabbing her repeatedly with a butcher knife, leaving her permanently disfigured. He also confessed to raping, sodomizing, and killing Tabitha Bosdell and two other women in South Carolina in a similar manner. The cases listed in the Appendix support the imposition of the death penalty in this case in that all involve a deliberate murder during the commission of a rape or an aggravated battery, OCGA § 17-10-30 (b) (2), or involve evidence that the defendant murdered multiple persons, either in one transaction or, as in Rivera's case, in several transactions. OCGA § 17-10-35 (e). Considering the crime and the defendant, we find that the sentence of death in this case is not excessive or disproportionate. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Williams v. State*, 281 Ga. 87 (635 SE2d 146) (2006); *Lewis v. State*, 279 Ga. 756 (620 SE2d 778) (2005); *Lewis v. State*, 277 Ga. 534 (592 SE2d 405) (2005); *Raheem v. State*, 275 Ga. 87 (560 SE2d 680) (2002); *Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002); *McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001); *Morrow v. State*, 272 Ga. 691 (532 SE2d 78) (2000); *Drane v. State*, 271 Ga. 849 (523 SE2d 301) (1999); *Johnson v. State*, 271 Ga. 375 (519 SE2d 221) (1999); *Sears v. State*, 270 Ga. 834 (514 SE2d 426) (1999); *Perkins v. State*, 269 Ga. 791 (505 SE2d 16) (1998); *Pye v. State*, 269 Ga. 779 (505 SE2d 4) (1998); *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995).

DECIDED JUNE 25, 2007 —
RECONSIDERATION DENIED JULY 27, 2007.

*Peter D. Johnson*, for appellant.

*Daniel J. Craig, District Attorney, Madonna M. Little, Assistant District Attorney, Thurbert E. Baker, Attorney General, Theresa M. Schiefer, Assistant Attorney General*, for appellee.