## S10A0393. WILLIS v. THE STATE.
### (699 SE2d 1)

MELTON, Justice.

Following a jury trial, Aaron Brandon Willis appeals his convictions for the robbery and burglary of Joseph Briglevich as well as the kidnapping, armed robbery, and murder of Ramona Agramontes.[1] Among other things, Willis contends that his confession to these crimes was involuntary. For the reasons set forth below, we affirm.

1. In the light most favorable to the verdict, the record shows that, on June 6, 2003, two masked and armed men broke into Briglevich's home, tied him up, and stole money and a .45 caliber handgun from him. Approximately two weeks later, a call was made from a payphone near Willis' apartment requesting a cab. Agramontes was dispatched to pick up this caller. The next night, July 1, 2003, Agramontes' body was found on the ground in a wooded area. Her taxicab was nearby with its engine still running. Agramontes had been murdered with a .45 caliber handgun, and ballistics testing showed that it was the same handgun that had been stolen from Briglevich. In a recorded statement made to police on April 15, 2004, Willis admitted to the crimes against both Agramontes and Briglevich. Three days later, while being held in jail, Willis made a written confession to murdering Agramontes, as well as robbing and murdering another victim, John Evans, in February of 2004. The circumstances of Evans' murder were admitted at trial as a similar transaction.[2]

This evidence was ample to support the jury's finding that Willis was guilty of the crimes for which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[1] On October 8, 2004, Willis was indicted for the robbery and burglary of Briglevich, as well as the kidnapping, armed robbery, felony murder, and malice murder of Agramontes. Following a jury trial, Willis was found guilty on all counts. On March 21, 2006, Willis was sentenced to life in prison for malice murder and armed robbery, and he was also sentenced to 20 consecutive years each for burglary, robbery, and kidnapping. On March 24, 2006, Willis filed a motion for new trial that was denied on April 17, 2009. After Willis filed his notice of appeal on April 30, 2009, this case was docketed in this court for the January 2010 Term and orally argued on February 9, 2010.

[2] Evans was shot in the head with a 9-millimeter weapon, and his truck was stolen. Two months later, while executing a warrant for the search of Willis' apartment, police found Evans' truck keys, credit cards, and camera.

2. Willis erroneously contends that his custodial statement confessing to the crimes in issue was improperly admitted into evidence because police failed to end the interrogation after Willis unambiguously invoked his right to counsel.

> A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation. If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

(Citations and punctuation omitted.) *McDougal v. State*, 277 Ga. 493, 498-499 (1) (B) (591 SE2d 788) (2004).

> Invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." [Cit.] But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning. [Cits.]

*Jordan v. State*, 267 Ga. 442, 444 (1) (480 SE2d 18) (1997).

The relevant portion of Willis' audio-recorded interview is as follows:

> Detective: This is saying that I advised you of your [*Miranda*] rights and you know what your rights are and you're going to talk to me. Okay?
> Willis: Uhm —
> Detective: That's all that says.
> Willis: I don't have a problem answering any questions, but I still (inaudible), though, if I can.
> Detective: *You want an attorney before you talk to us?*
> Willis: *No. I'm saying I don't have any problem answering any questions, but I still do want an attorney.*

Detective: All right. But that's — I don't understand. Are you wanting an attorney before you answer questions?

Willis: How long would that take before you could get one here?

Detective: Well, I don't know. I mean — you're under arrest for the assault, so you would go to jail without talking to us. Okay. You're signing the form saying that you understand your rights — right — and that you're talking to us without an attorney present right now. And you understand you can stop answering at any time; right? You understand all that?

Willis: Yes.

Detective: All right. I can't hear you because I'm deaf in one ear.

Willis: Yes.

Detective: *Okay. So I just want to make sure we understand each other. You're saying that you don't want an attorney right now to talk to us, but you realize you can talk — stop talking at any time.*

Willis: *Yes.*

(Emphasis supplied.) It is clear from this exchange that, in this case, Willis' initial reference to an attorney was ambiguous as to whether he presently wanted an attorney or simply wanted one in the future. Under these circumstances, the interrogating officer reasonably attempted to clarify Willis' request, and Willis indicated that he was requesting the future assistance of an attorney, not immediate assistance.[3] Under these circumstances, Willis' custodial statement was admissible against him. See *Johnson v. State*, 289 Ga. App. 41 (656 SE2d 200) (2007). The trial court did not err.

3. Willis also erroneously argues that his written confession to the murders of Evans and Agramontes is inadmissible pursuant to the clergy-parishioner privilege of OCGA § 24-9-22.[4] This conten-

---

[3] For this reason, our opinions in *Robinson v. State*, 286 Ga. 42 (684 SE2d 863) (2009), and *Manley v. State*, 287 Ga. 338 (698 SE2d 301) (2010), are distinguishable from the present matter.

[4] This Code section provides:

Every communication made by any person professing religious faith, seeking spiritual comfort, or seeking counseling to any Protestant minister of the Gospel, any priest of the Roman Catholic faith, any priest of the Greek Orthodox Catholic faith, any Jewish rabbi, or to any Christian or Jewish minister, by whatever name called, shall be deemed privileged. No such minister, priest, or rabbi shall disclose any communications made to him by any such person professing religious faith, seeking spiritual guidance, or seeking counseling, nor shall such minister, priest, or rabbi be competent or compellable to testify with reference to any such communication in any court.

tion fails because Willis voluntarily made his confession to law enforcement after repeatedly being questioned whether that was what he wanted to do.[5]

The record shows that Willis, while in jail, initially told the prison chaplain that he wished to confess. The chaplain testified that he instructed Willis that "[i]f you want to do a confession, you don't do it to the chaplains. You do it to the proper authorities. . . . And I asked [Willis], I go, is this what you want to do? And he said, yes." The chaplain further testified that he never told Willis that he had to give any confession to police against his wishes. To the contrary, the chaplain testified that a law enforcement officer was brought to the room to take a confession *at Willis' request*. After the police officer entered the room, he asked Willis if he wanted to confess, and Willis confirmed that he did. The law enforcement officer then informed Willis that, if he did confess, the confession would be forwarded to the detective who was handling his case. With all of this information, Willis made his confession, knowing that it would be handed over to law enforcement in the case against him.

Under these circumstances, the clergy-parishioner privilege is simply not applicable because Willis knowingly gave the confession to law enforcement, not privately to the chaplain. The chaplain did not disclose the confession to police. To the contrary, Willis did so himself. Moreover, even if there were any clergy privilege at play in this case, it was repeatedly waived. The chaplain testified that he sought out law enforcement at Willis' request, and both the chaplain and the officer who took the confession first made certain that Willis understood what he was doing and that he wanted to do it.

To reach the contrary result, the dissent makes a number of factual findings which have no support in the record. For example, the dissent states: "[Willis] never sought to waive the privilege; rather, the chaplain conditioned further spiritual guidance upon [W]illis making a confession to the 'proper authorities.' " Nothing in the record supports this finding that the chaplain coerced Willis into giving a confession by withholding spiritual services. In fact, the opposite is true. Although the chaplain instructed Willis that he could not take a confession, he remained available for spiritual guidance, and he specifically testified that he never told Willis that a confession to law enforcement was required. The spiritual embargo cited by the dissent simply did not exist, and the only evidence of record indicates that Willis informed both the chaplain and law

---

[5] OCGA § 24-3-51 also supports the admission of Willis' confession. This statute provides: "The fact that a confession has been made under a spiritual exhortation, a promise of secrecy, or a promise of collateral benefit shall not exclude it."

enforcement that he wanted to confess. Moreover, it is not the function of this Court to impose its own concepts of proper spiritual guidance on the parties before us, especially in a case like this one in which the chaplain expressly testified that he was only there to provide religious help and that he believed that providing Willis the opportunity to confess to law enforcement was the right thing to do as chaplain.

4. Willis contends that the trial court erred by admitting evidence of the February 2004 murder of Evans as a similar transaction. The decision of a trial court to admit evidence of similar transactions will be upheld unless there has been an abuse of the trial court's discretion. *Colbert v. State*, 275 Ga. 525, 526 (2) (570 SE2d 321) (2002).

> Similar transaction evidence must satisfy three elements to be admitted: (1) the evidence must be introduced for a proper purpose; (2) the evidence must establish by a preponderance of the evidence that the defendant perpetrated the similar transaction; and (3) the two transactions must be sufficiently similar or connected so that the existence of the former transaction tends to prove the latter transaction. [Cits.]

*Bryant v. State*, 282 Ga. 631, 634 (3) (651 SE2d 718) (2007). Willis does not challenge either the trial court's finding that he perpetrated Evans' murder (to which Willis confessed in any event) or the finding that the Evans' murder was sufficiently similar to the murder of Agramontes.[6] Willis argues only that the Evans murder was not introduced for an appropriate purpose. The record belies this contention. The trial court admitted the Evans murder to show motive, a common plan or scheme, course of conduct and bent of mind. As the murders of Evans and Agramontes were sufficiently similar in execution and were motivated by robbery of the victim, the trial court did not abuse its discretion in admitting the similar transaction evidence for the valid purposes listed above.

5. Willis argues that the trial court erred by denying his motion to prohibit the District Attorney from addressing the traverse jury pool. Specifically, Willis argues that, as a result, his right to a trial by a fair and impartial jury was violated.

The record shows that the traverse jury pool for the Superior Court of Cobb County is given a brief orientation when they report for duty. As part of this orientation, the District Attorney identifies

---

[6] In both murders, Willis robbed the victims, shot them in the head with a handgun, and stole the victims' vehicles.

himself to the jurors and tells them that he would be willing to answer any questions they might have after their jury service is over. Although the District Attorney does not address any cases or defendants with the traverse jury pool at this time, this Court is strained to conceive of any legitimate purpose that is served by allowing the District Attorney to address the traverse jury pool. See, e.g., *House v. State*, 237 Ga. App. 504 (2) (c) (515 SE2d 652) (1999). However, there is no indication that the character of the District Attorney's remarks clearly show that they could have been prejudicial to Willis. Furthermore, Willis has made no attempt to show any such prejudice. Willis offers no evidence of any juror being partial on appeal. Under these circumstances, the trial court's ruling does not constitute reversible error.

6. Finally, Willis contends that the trial court erred by denying his challenge based on *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), in which he argued that the State improperly used peremptory strikes against the only two African-Americans who were potential members of the jury. To establish a *Batson* violation,

> [f]irst, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."

(Citations and footnote omitted.) *Johnson v. California*, 545 U. S. 162, 168 (125 SC 2410, 162 LE2d 129) (2005). See also *Rakestrau v. State*, 278 Ga. 872, 874 (608 SE2d 216) (2005).

In this case, after the trial court found a prima facie case of discrimination had been shown by Willis, the State explained that: (1) it struck one potential African-American juror because he had been charged with leaving the scene of an accident and that fleeing the scene could be indicative of a mistrust of law enforcement and (2) it struck the other potential African-American juror because she indicated that she had a nephew who had been jailed after being falsely accused. The trial court did not err by accepting these reasons for the State's strikes. The State's tendered reasons were "based on something other than the race of the juror" and, thus, were facially race-neutral. *Hernandez v. New York*, 500 U. S. 352, 360 (II) (B) (111 SC 1859, 114 LE2d 395) (1991). See also *Daniels v. State*, 276 Ga. 632

(3) (580 SE2d 221) (2003) (African-American juror who had a close friend or family member falsely accused of a crime was properly struck from jury). Furthermore, Willis has not proven that the State's proffered reasons for striking the jurors in question did not apply. Considering the totality of the circumstances, the trial court's *Batson* ruling in this case was not clearly erroneous.

*Judgment affirmed. All the Justices concur, except Hunstein, C. J., Benham and Hines, JJ., who dissent.*

BENHAM, Justice, dissenting.

I respectfully dissent from the majority's opinion because I believe the trial court's admission of appellant's custodial statements was erroneous.

1. This case is no different than *Robinson v. State*, 286 Ga. 42 (684 SE2d 863) (2009). In that case, after being read his *Miranda* rights, the defendant responded to questioning as follows:

Detective: Knowing these rights that I just advised you, do you wish to speak to me without an attorney present?
Robinson: Uhm, yeah, I would like a lawyer.

This Court determined that, despite the words "uhm yeah," a seemingly affirmative response to the leading question asked, the defendant had invoked his right to counsel. Accordingly, the State was barred from using the defendant's custodial statement during its case-in-chief.

The facts of this case are nearly identical to *Robinson*. At the start of appellant's audio-recorded custodial interview, the following exchange took place between appellant and the police detective:

Detective: This is saying that I advised you of your rights and you know what your rights are and you're going to talk to me. Okay?
Willis: Uhm —
Detective: That's all that says.
Willis: I don't have a problem answering any questions, but I still (inaudible), though, if I can.
Detective: You want an attorney before you talk to us?
Willis: No. I'm saying I don't have any problem answering any questions, but I still do want an attorney.

Although appellant uttered the word "no," in a seemingly negative response to the leading question asked, he stated in the very next breath that he wanted an attorney. Since the word "no" was

immediately followed by appellant's unequivocal statement that "I still do want an attorney," the word "no" was a filler word that does not obfuscate the clear request for counsel. In fact the word "no" can reasonably be understood as negating the assumptions made by the officer in her question and clearing the way for appellant to clearly communicate his request for representation. He states that he wants to cooperate, but otherwise uses no qualifiers or equivocal words regarding his request. See *Robinson*, supra, 286 Ga. at 44 (the defendant did not use any equivocal words such as "might" or "maybe"). The fact that appellant stated a willingness to cooperate in any police questioning did not negate his request for a lawyer. See *Manley v. State*, 287 Ga. 338 (7) (698 SE2d 301) (2010). Nor did his statement indicate that he wished for a lawyer in the future. Id. At the moment appellant uttered "I still do want an attorney," the detective should have ceased all questioning until an attorney could be hired or appointed for appellant. *Robinson*, 286 Ga. at 44-45.

The majority mentions in a footnote that *Robinson* and *Manley* are distinguishable from the instant case, but fails to provide an explanation for that conclusion. In fact, the cases are not distinguishable. In this case and in *Robinson*, the facts at issue are nearly identical: both defendants were asked leading questions by police asking them whether they wanted an attorney before speaking to authorities; both defendants said they wanted a lawyer; and neither defendant mentioned any qualifiers as to when the lawyer should be appointed. Like the defendant in *Manley*, appellant stated a willingness to cooperate with police and also his desire for counsel. In both *Robinson* and *Manley*, this Court determined that the defendants had invoked their rights to counsel. There is no basis for this Court to depart from precedent[7] and, accordingly I would reverse.

2. Three days after his custodial interview, appellant asked to speak with the jailhouse chaplain[8] in order to seek spiritual guidance. The two spoke in a private room for about thirty minutes when appellant advised the chaplain he wanted to confess. The chaplain told appellant he did not "do confessions" and that appellant had to confess to the "proper authorities."[9] The chaplain left the room, told

---

[7] Rather than following this Court's precedent in *Robinson* and *Manley*, decided in 2009 and 2010, respectively, the majority relies on a 2007 Georgia Court of Appeals decision (*Johnson v. State*, 289 Ga. App. 41 (656 SE2d 200) (2007)) to uphold its conclusion. *Johnson* is distinguishable from this case because in that case the defendant told authorities that he could wait until the interrogation was done to call for an attorney. No such statement was made by appellant in this case.

[8] The chaplain was an independent contractor paid by the sheriff's department to provide spiritual guidance to detainees.

[9] The chaplain had no knowledge that appellant had already made a statement to authorities admitting to the crimes in question.

a police sergeant that appellant wanted to confess, and returned to the room with the sergeant. The sergeant asked appellant if he was sure he wanted to "do this," appellant nodded, and the sergeant retrieved a pen and paper. Appellant wrote out his confession, handed it to the chaplain, and the chaplain handed it to the sergeant who was standing in the doorway. In the document, appellant wrote, "My misfortunate journey began . . . the day I lost touch with my savior," and ended with "I saw a church near eastpoint [sic] and something said stop running." At the motion to suppress hearing, the chaplain testified that it was his understanding that appellant was making the confession as an act to clear his conscience for prayer:

> Defense counsel: And [appellant] indicated to you that he wanted to confess to you everything he had done for the purpose of clearing his conscience and praying about it?
> Chaplain: Yes.

There was no other stated purpose for the confession.
OCGA § 24-9-22 provides:

> Every communication made by any person professing religious faith, seeking spiritual comfort, or seeking counseling to any Protestant minister of the Gospel, any priest of the Roman Catholic faith, any priest of the Greek Orthodox Catholic faith, any Jewish rabbi, or to any Christian or Jewish minister, by whatever name called, shall be deemed privileged. No such minister, priest, or rabbi shall disclose any communications made to him by any such person professing religious faith, seeking spiritual guidance, or seeking counseling, nor shall such minister, priest, or rabbi be competent or compellable to testify with reference to any such communication in any court.

Under this statute, any communication to a member of the clergy that is for the express purpose of seeking and receiving spiritual comfort, guidance or counseling is privileged. *Alternative Health Care Systems v. McCown*, 237 Ga. App. 355 (5) (514 SE2d 691) (1999) (trial court properly excluded a hospice chaplain from testifying at trial in a dispute concerning whether the decedent's wife consented to organ donation). It is undisputed that appellant sought out the chaplain to receive spiritual guidance. When appellant confided to the chaplain that he wanted to confess, the chaplain was barred by OCGA § 24-9-22 from disclosing to anyone, including the "proper authorities," any communication between himself and appellant.

While the chaplain was not required to "do confessions," the statute expressly prohibited him from disclosing to anyone that appellant said he wanted to confess. Id. See also *State v. Jackson*, 77 N.C. App. 832 (336 SE2d 437) (1985) (trial court erred when it allowed a pastor to testify as to comments made by defendant while receiving spiritual counseling). Therefore, the majority opinion misses the mark when it states that the "chaplain did not disclose the confession to police." By bringing the police sergeant into the discussion concerning appellant's desire to confess, the chaplain abandoned his role as a neutral spiritual counselor and became a conduit of the police. Had the chaplain simply informed appellant that he did not "do confessions" and left the conversation as it was or continued with providing spiritual counseling to defendant, no violation of the privilege would have occurred. Thus, the trial court erred when it determined the privilege had not been violated.

Appellant never sought to waive the privilege; rather, the chaplain conditioned further spiritual guidance upon appellant making a confession to the "proper authorities." Since appellant had confessed to the authorities only three days earlier, it strains credulity that appellant intended to confess once again to police. Appellant's confession at this stage was simply to comply with the chaplain's instruction that he had to confess to the "proper authorities" in order to clear appellant's conscience for prayer. Indeed, with its references to a "savior" and "church," appellant's written confession indicates that appellant was in fact still seeking spiritual guidance and not further communication with authorities. The clergy privilege was violated in this case and the taint from that violation rendered the written statement inadmissible at trial. Accordingly, I would reverse.

I am authorized to state that Chief Justice Hunstein and Justice Hines join in this dissent.

DECIDED JUNE 28, 2010 —
RECONSIDERATION DENIED JULY 26, 2010.

*Gregory A. Hicks*, for appellant.
*Thurbert E. Baker, Attorney General, Christopher R. Johnson, Assistant Attorney General, Patrick H. Head, District Attorney, Dana J. Norman, John R. Edwards, Assistant District Attorneys*, for appellee.