In the Supreme Court of Georgia

Decided: October 20, 2014

S14A0795.  RUSSELL v. THE STATE.

HUNSTEIN, Justice.

Appellant Demetrius Russell was convicted of two counts of murder and related offenses in connection with the June 22, 2008 shooting deaths of Victoria Renfroe and Andrea Smith.  Russell now challenges his convictions, contending that the evidence was insufficient and that the trial court erred in declining to instruct the jury on voluntary manslaughter and in various evidentiary rulings.  Finding no error, we affirm.[1]

Construed in the light most favorable to the jury's verdicts, the evidence

[1]Russell was indicted by a DeKalb County grand jury in July 2008 on two counts of malice murder, two counts of felony murder, two counts of aggravated assault, and one count of third degree child cruelty.  Russell was re-indicted in May 2009 on the same counts and was tried July 13 through 17, 2009.  The jury convicted Russell on all counts, and the trial court thereafter sentenced him to two consecutive terms of life imprisonment on the malice murder counts and a consecutive 12-month term on the child cruelty count; the remaining counts merged or stood vacated by operation of law.  On September 4, 2009, Russell filed a timely motion for new trial, which was denied on August 28, 2013.  Russell filed a notice of appeal on September 13, 2013.  The appeal was docketed to the April 2014 term of this Court and was thereafter submitted for decision on the briefs.

adduced at trial established as follows. At approximately 5:00 a.m. on June 22, 2008, Victoria Renfroe and Andrea Smith were shot and killed at Renfroe's home on Eastwood Drive in DeKalb County, where the two women were living with their young children. Renfroe's next door neighbor, who at that time was in his driveway preparing to leave for work, heard nine gunshots and female screams from the home and then observed a man run out of the front door of the house holding a gun. The neighbor called 911, and responding officers found the victims: Smith had been shot dead while lying on a living room sofa, and Renfroe had been shot dead lying in a bed. There were no signs of forced entry into the home.

Appellant Demetrius Russell was Renfroe's estranged husband. At the time of the shooting, the couple were separated, and Renfroe was actively pursuing a divorce. Trial testimony established that Russell had been at Renfroe's home in the hours before the early morning shooting. Natasha Cato, a close friend of Renfroe, testified that, at approximately 6:00 p.m. on the night before the shooting, Renfroe picked her up at work with Russell in the car and drove them all to the Eastwood Drive house. Cato eventually left the home that evening, but she spoke by phone with Renfroe at approximately 2:00 a.m.,

2

during which she overheard Russell and Renfroe yelling at one another and a door slamming.

Smith's oldest son, Anjuan, who was 12 years old at the time of the shooting, testified that on the morning of June 22, 2008 he awoke to gunshots, came out of his room, and saw Russell run out of the house. One of Smith's daughters, seven-year-old Ariyanna Cato, testified that she heard gunshots and saw a man run out the front door of the house with a gun. She testified further that the shooter was wearing red and white Nike shoes, which she recognized as Russell's. Further trial testimony confirmed that Russell had been wearing red and white Nike shoes in the hours before the shooting, and a police detective testified that Russell was wearing red, white, and black Nike tennis shoes at the time of his questioning and eventual arrest, which took place in the afternoon on the day of the shooting.

In a statement to police, Russell claimed he had been at the home of his girlfriend Shantricia Anderson from 11:30 p.m. on June 21 until 6:00 a.m. the following morning. Cell phone records indicated, however, that all activity on Russell's phone taking place during that time period, including a transmission at 5:01 a.m., had been transmitted through the cell tower closest to the victims'

home, rather than through the cell tower closest to Anderson's home.

Evidence of prior difficulties between Renfroe and Russell was adduced from MARTA police officer Randolph Wilborn, who testified that in February 2002, he witnessed Russell holding Renfroe in a chokehold with his hands around her neck; on Wilborn's order for him to stop, Russell shoved Renfroe against a wall. Natasha Cato also testified that on one occasion in December 2007, she had observed Russell grab Renfroe by the arms, jerk her, and threaten to kill her.

Cell phone records reflected that Russell had sent Anderson various text messages on the morning of the shooting: a 5:17 a.m. text read, "Ova ur house since 12"; an 8:18 a.m. text read, "I left ur house bout 6 walkin home cuz I had no money"; an 11:23 a.m. text read, "I had on white T N black shorts."

1. The evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Russell was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Anjuan Smith identified Russell as the man who ran from the home immediately after the shots were fired, and this identification

4

was corroborated by Ariyanna, who recognized the shoes the shooter was wearing as those belonging to Russell. The evidence established both a motive and an opportunity for Russell to commit the murders. Moreover, Russell's text messages are reflective of an effort to fabricate an alibi, which was debunked by the cell phone records indicating Russell's likely presence at Renfroe's home, rather than Anderson's, in the hours and minutes leading up to the shooting. The evidence was clearly sufficient to support Russell's convictions.

2. Russell contends that the trial court erred in refusing his request to give a jury instruction on voluntary manslaughter.

> When instructing the jury in a murder case, a trial court is required to grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge. [Cit.] Whether such slight evidence exists is a question of law. [Cit.] The crime of voluntary manslaughter is committed when one kills "solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16–5–2(a).

Blake v. State, 292 Ga. 516, 518 (3) (739 SE2d 319) (2013). Here, we conclude that the trial court properly declined to instruct the jury on voluntary manslaughter because there was no evidence to support such a charge. Though there was evidence of ongoing marital difficulties between Russell and Renfroe

5

and past acts of violence committed by Russell against Renfroe, there was no evidence of any specific provocation at or around the time of the murders such as would generate the "sudden . . . and irresistible passion" necessary to support a conviction for voluntary manslaughter. See, e.g., Culmer v. State, 282 Ga. 330, 335 (4) (647 SE2d 30) (2007) (even evidence of the victim's adultery does not support a voluntary manslaughter charge if there is no evidence that the defendant learned of the conduct immediately prior to the killing so as to inflame a "sudden" passion in the defendant). The mere fact that the couple was heard arguing approximately three hours prior to the shooting is not itself sufficient to support an instruction on voluntary manslaughter. See, e.g., Moore v. State, S14A0988, slip op. at 13 (4), 2014 WL 4664069 (decided Sept. 22, 2014) (fighting prior to a homicide does not ordinarily constitute the requisite provocation to support a charge on voluntary manslaughter); Funes v. State, 289 Ga. 793 (2) (716 SE2d 183) (2011) (same). This enumeration is, thus, without merit.

3. Russell next contends that the trial court erred in excluding evidence the defense sought to introduce regarding a drug-related armed robbery allegedly perpetrated on the victims some 32 hours prior to the murders. The

defense had sought to adduce such evidence in support of a theory that the murders had been committed by the same individual(s) who had allegedly committed the robbery. We find no error in the trial court's ruling on this issue.

Evidence implicating another individual as the actual perpetrator of a crime is admissible only if it identifies a specific person having a direct connection with the corpus delicti. Azizi v. State, 270 Ga. 709 (6) (512 SE2d 622) (1999). "'Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.'" Id. at 713. Accord Griffin v. State, 280 Ga. 683, 686 (3) (631 SE2d 671) (2006) (trial court properly excluded evidence about another murder bearing similarities to crimes at issue because there were no identified suspects in that murder and thus evidence would "merely speculate that some unknown person may have committed the crime"). Here, the connection between the robbery and the victims' murder was purely conjectural, and the evidence was thus properly excluded for this reason. Moreover, the proffered evidence, to the extent it would have implicated the victims in drug-related activities bearing only a speculative factual nexus with the crimes at issue here, was inadmissible character evidence. See, e.g.,

7

Roseberry v. State, 274 Ga. 301 (2) (553 SE2d 589) (2001) (affirming exclusion of evidence regarding victim's debts and alleged illegal activities because it lacked a sufficient factual nexus with the crimes at issue).

4. Russell also challenges the trial court's refusal to declare a mistrial as the result of a non-responsive statement by Officer Wilborn during his direct examination. In the course of his testimony regarding the February 2002 MARTA station incident, Wilborn was asked whether he had obtained any witness statements regarding the incident, and in responding he stated "there was one other guy [sic] said he had also got assaulted." The defense immediately objected, and, following a bench conference, the trial judge instructed the jury to disregard the statement in question. We conclude that the trial court properly addressed the potential prejudice from this statement – which could have been construed as improper evidence of Russell's commission of a similar transaction – by ordering jurors to disregard it and instructing Wilborn outside the jury's presence to refrain from referencing any incidents other than Renfroe's assault. See Bunnell v. State, 292 Ga. 253 (4) (735 SE2d 281) (2013) (noting that curative instructions are generally adequate to remedy a witness' inadvertent and non-responsive reference to the accused's prior criminal acts);

8

Scruggs v. State, 273 Ga. 752, 753 (2) (545 SE2d 888) (2001) (affirming use of curative instructions as an alternative to mistrial where such instructions "adequately preserve[] appellant's right to a fair trial"). The trial court did not abuse its discretion in declining to declare a mistrial. See Bunnell, 292 Ga. at 257-258; Scruggs, 273 Ga. at 753.

5. Russell next asserts error in the trial court's refusal to allow the defense to refresh the recollection of seven-year-old Ariyanna Cato by showing her a video recording of her forensic interview in its entirety. Even assuming the trial court erred in limiting the defense's use of the video to refresh Ariyanna's recollection – an issue which, particularly in light of the witness' tender age, we expressly decline to decide – we find no harm to the defense resulting from the limitations imposed. The record reflects that the defense actually succeeded, despite these limitations, in eliciting from Ariyanna testimony that arguably impeached Natasha Cato's assertion that she had not talked to any of the children about the murders before their forensic interviews. Russell offers no argument as to what additional testimony the defense expected to have elicited from Ariyanna had she been permitted to view the video in its entirety. Accordingly, it is highly probable that any error in this regard did not contribute

9

to the jury's verdict. See generally Rivera v. State, 295 Ga. 380 (2) (761 SE2d 30) (2014).

6. As to Russell's remaining enumeration regarding the admission of evidence regarding the February 2002 MARTA station incident, we note as an initial matter that Russell failed to object at trial on the grounds he now asserts. Though the defense unsuccessfully argued for the inclusion of certain language in the trial court's jury charge on evidence of prior difficulties, and then unsuccessfully moved for a mistrial when Officer Wilborn alluded to a different assault, see Division 4, supra, the defense did not object generally to the admission of evidence regarding the 2002 incident. Accordingly, Russell has failed to preserve this issue for appellate review. See Moore, slip op. at 10. Moreover, even assuming Russell had preserved this issue, there was no error in admitting this evidence, as "evidence of prior difficulties between [Russell] and the victim was admissible as proof of their relationship and to show [Russell's] motive and intent." Faircloth v. State, 293 Ga. 134, 137 (2) (744 SE2d 52) (2013).[2] That several years elapsed between the 2002 incident and the

---

[2]The rules for admissibility of such evidence under the new Georgia Evidence Code, effective for trials commenced on or after January 1, 2013, are codified at OCGA § 24–4–404 (b).

2008 murders bears not on the admissibility of the evidence but rather only on its evidentiary weight. See <u>Rowe v. State</u>, 276 Ga. 800 (5) (582 SE2d 119) (2003). This enumeration is, therefore, without merit.

<u>Judgment affirmed. All the Justices concur.</u>