In the Supreme Court of Georgia

Decided: November 17, 2014

S14A0877.  FRANCIS v. THE STATE.

HUNSTEIN, Justice.

Appellant Thomas Marlin Francis was convicted by a jury of murder and

related offenses for the October 31, 2006 shooting death of his wife, Denise

Michele Francis.  Francis appeals the denial of his amended motion for new

trial, contending that the evidence was insufficient for a jury to find him guilty;

the trial court erred by denying his motion to suppress his custodial statement

and refusing to give specific jury charges; and his trial counsel rendered

ineffective assistance.  Finding no error, we affirm.[1]

---

[1] On January 5, 2007, a Newton County grand jury indicted Francis for malice
murder, two counts of felony murder, two counts of aggravated assault, four counts
of possession of a firearm during the commission of a felony, family violence battery,
and obstruction of an emergency call.  During August 4-7, 2008, Francis was tried
before a jury.  On August 7, 2008, the jury returned a verdict of guilty on all counts.
On August 14, 2008, the court sentenced Francis to life imprisonment for malice
murder; a consecutive five-year term for possession of a firearm during the
commission of felony; a consecutive 12-month term for family violence battery; and
a consecutive 12-month term for obstruction of an emergency call.   The remaining
counts merged or were vacated by operation of law.  Francis filed a motion for new
trial on September 12, 2008, which was amended on September 30, 2013. After a

Viewed in the light most favorable to the jury's verdict, the evidence adduced at trial established as follows. By 2006, Francis had been married to his wife for approximately five years, and they had a tumultuous relationship. The night before the shooting, Francis and his wife had argued, and they slept in separate bedrooms. The next morning, Francis got dressed, heard his wife in the master bathroom, and carried a loaded gun to the master bathroom. When his wife saw the gun in his hand, she jumped up, overturned the stool on which she had been sitting, picked up a knife off of the bathroom counter, and backed away from Francis. Francis shot her two times from approximately three feet away. Francis walked to the living room, but then returned to the master bathroom, where he found his wife on the floor talking on the phone with 911. His wife told the 911 operator that her husband had shot her and was kicking her. Francis pushed the phone with his foot out from under her ear, put the phone up to his ear, heard nothing, and hung up. He ripped the phone cord out from the back of the phone. His wife moved, and Francis shot her again in the

hearing on Francis' amended motion for new trial on October 3, 2013, the trial court denied Francis' motion on December 20, 2013. Francis filed a notice of appeal on December 23, 2013. The appeal was docketed to the April 2014 term of this Court and submitted for a decision on the briefs.

back of the head. A 911 operator returned the call to Francis' home, and Francis eventually answered, telling the operator that he had shot his wife and that she had a knife. When officers arrived at the scene, they found the victim, deceased and lying in the doorway of the master bathroom. They also found a gun with the clip removed lying on a sofa in the living room. Francis testified that he killed his wife because he was scared of her. He also told officers that he was "glad he shot her. Because she was mean and vindictive as hell and would not leave things alone."

The medical examiner testified that the victim sustained one gunshot wound to the mouth and one to the chest, neither of which would have been immediately lethal. She also sustained a gunshot wound to her head, which passed through her brain stem, and would have caused her death instantaneously. Although the medical examiner testified that he could not determine the sequence of the gunshots, in his expert opinion, the victim would have been able to make a phone call after suffering the shots to her mouth and chest, but she would not have been able to do so after the shot to her head.

Investigators found a knife at the entrance to the master bathroom. According to a GBI investigator, no blood or fingerprints were found on the

3

knife, and due to the blood spatter patterns, he believed the knife was placed on the ground after the shooting had occurred. The investigator also opined that the victim was seated at the counter in the bathroom when she sustained the gunshot wound to the mouth.

Several witnesses testified that they had observed Francis' wife verbally abuse him, although none had witnessed or learned of any physical abuse by his wife against him. Francis testified that several months before the shooting, his wife had cut him with a knife on his arms and thrown a hammer at him, but he had not mentioned these incidents to anyone because he was embarrassed. An expert for the defense testified that at the time of the shooting, Francis was suffering from post traumatic stress disorder ("PTSD") and battered person syndrome ("BPS"), and therefore, he would not have been thinking logically at the time of the shooting. The expert opined further that she believed Francis was terrified that his wife was going to hurt or kill him. An expert for the State testified that at the time of the shooting, Francis would have understood the difference between right and wrong, and he was not delusional or dissociative.

1. Francis argues that the evidence was insufficient to convict him and that his mental state at the time of the shooting, which included suffering from

BPS and PTSD, as well as his justification theory, acted as an absolute defense. He also contends that there was no evidence of any malice or criminal intent. We find that the evidence was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that Francis was guilty of the crimes of which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); see also Vega v. State, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'") (citation omitted). The court charged the jury on self-defense and justification, and it was within the province of the jury to assess the evidence and determine whether Francis acted in self-defense. See White v. State, 287 Ga. 713, 715 (1) (b) (699 SE2d 291) (2010) ("the issues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense"). Although Francis initially told officers that his wife pulled a knife on him first and then he shot her, he never testified at trial that his wife moved towards him with a knife. In fact, he testified at trial that after he entered the bathroom, she picked up a knife and backed away from him towards a corner of the bathroom. Additionally, the evidence showed that while his wife called

5

for help, Francis kicked her, took the phone from her, ripped the phone cord out of the phone, and then fatally shot her in the back of the head.  He also told officers that he was glad he had killed her.  This is sufficient evidence to sustain a conviction for malice murder.  See Williams v. Kemp, 255 Ga. 380, 385-386 (338 SE2d 669) (1986) ("[u]nder state law malice aforethought comprises two elements: intent to kill and the absence of provocation or justification").

2. Francis contends that the trial court erred by refusing to give the jury (1) a voluntary manslaughter charge and (2) a specific BPS charge.  "A trial court is required to give a requested charge on voluntary manslaughter if there is slight evidence showing that the victim seriously provoked the defendant, causing the defendant to kill the victim solely as the result of a sudden, violent, and irresistible passion, OCGA § 16-5-2(a)."  Merritt v. State, 292 Ga. 327, 331 (2) (737 SE2d 673) (2013) (punctuation omitted).  "Though there was evidence of ongoing marital difficulties between [Francis] and [his wife] and past acts of violence committed by [his wife] against [Francis], there was no evidence of any specific provocation at or around the time of the murders such as would generate the 'sudden . . . and irresistible passion' necessary to support a conviction for voluntary manslaughter."  Russell v. State, S14A0795, slip op. at 5-6 (2), 2014

6

WL 5313906 (decided Oct. 20, 2014); Nichols v. State, 275 Ga. 246, 246-47 (2) (563 SE2d 121) (2002) ("fighting prior to a homicide 'does not constitute the type of provocation that would warrant a charge of voluntary manslaughter'"). Moreover, even though Francis told officers that his wife had come into his room the night before the shooting and threatened to kill him, "'words alone [generally] are not sufficient provocation to excite the passion necessary to give rise to voluntary manslaughter'" and several hours had passed between his wife's confrontation and the shooting. Merritt, 292 Ga. at 331 (voluntary manslaughter charge not warranted where the defendant and his wife had argued the night before the killing). Finally, even under Francis' initial version of events – where he told officers that his wife "came at" him with a knife – "this evidence shows that [Francis] was attempting to repel an attack, not that he was so angered that he reacted passionately." Bell v. State, 280 Ga. 562, 567 (5) (a) (629 SE2d 213) (2006). Francis testified that he shot his wife because he was scared of her, and this statement "'unequivocally shows that he was not angered or impassioned when [the] killing occurred.'" Davidson v. State, 289 Ga. 194, 196 (2) (709 SE2d 814) (2011) (firing a gun out of fear to defend one's own life and the life of others did not show a shooting in the heat of passion sufficient to

7

charge the jury on voluntary manslaughter).

With regard to BPS, the trial court gave the jury the pattern instruction on BPS and refused to give a supplemental charge requested by Francis because it was duplicative of the pattern charge.[2] "A trial court does not abuse its discretion in refusing to give a jury charge in the exact language requested when the charge given substantially covers the correct principles of law." Gamble v. State, 291 Ga. 581, 582 (2) (731 SE2d 758) (2012). After a review of the jury

_____

[2]The trial court's pattern charge was as follows:

> I charge you further that if you find from the evidence that the defendant suffers from Battered Person's Syndrome, you may consider that evidence in connection with the defendant's claim of self-defense. Now, such evidence relates to the issue of the reasonableness of the defendant's belief that the use of force was immediately necessary, even though no use of force against the
> defendant may have been, in fact, imminent. The standard is whether the circumstances were such that they would excite the fears of a reasonable person possessing the same or similar psychological and physical characteristics as the defendant and faced with the same circumstances surrounding the defendant at the time the defendant used force.

The supplemental charge requested by Francis stated the following:

> I charge you that battered-person evidence authorizes a finding that a reasonable individual who experienced prior physical abuse such as that suffered by the defendant at the hands of the victim would reasonably believe that the use of force was necessary on the occasion in question, even though that belief was erroneous.

8

charges, we find that the trial court did not abuse its discretion in refusing to give the supplemental charge because the supplemental charge was substantially the same as the pattern charge. See Stewart v. State, 286 Ga. 669 (6) (690 SE2d 811) (2010).

3. Francis argues that the trial court erred in denying his motion to suppress his custodial statement.

> Whether a defendant waives his rights under Miranda[3] and makes a voluntary and knowing statement depends on the totality of the circumstances. In ruling on the admissibility of an in-custody statement, a trial court must determine whether . . . a preponderance of the evidence demonstrates that the statement was made freely and voluntarily. Unless clearly erroneous, we accept the trial court's factual findings and credibility determinations relating to the admissibility of the defendant's statement. When controlling facts discernible from a videotape are not disputed, our standard of review is de novo.

Bunnell v. State, 292 Ga. 253, 255 (2) (735 SE2d 281) (2013) (citations and punctuation omitted). The Court may consider all the evidence of record, in addition to the evidence adduced at the Jackson-Denno[4] hearing, in determining the admissibility of a defendant's statement. Butler v. State, 292 Ga. 400, 404

---

[3]Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LEd 2d 694) (1966).

[4]Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LEd2d 908) (1964).

n.7 (2) (738 SE2d 74) (2013).

A. *Miranda Waiver*

Francis contends that his statement to law enforcement was inadmissible because he had been erroneously informed that he had to sign a Miranda waiver in order to make a statement. A GBI Special Agent interviewed Francis after he was taken into police custody on the day of the murder.[5] The agent began the interview by explaining that he wanted to talk to Francis about the shooting and that he would read from a standard waiver form that the GBI used for interviews. The agent read Francis his Miranda rights from the form and asked him if he had any questions about these rights, to which Francis replied, "No." The agent then said, "[I]f you will for me, if you'd like to speak with me, if you'll just initial these right here." Francis explained that he was unable to sign his name due to an injury to his hand, which was unrelated to the shooting, and the agent further stated, "Well, can you make an X or a line right here with your left hand? If you understand these and want to talk to me." Francis made his mark on the Miranda waiver form, and the interview proceeded with the agent

_____

[5]The interview was recorded and played for the jury at trial. The parties also submitted a written transcript of the interview.

10

asking Francis questions.

Francis argues that this case is similar to our decision in State v. Darby, 284 Ga. 271 (663 SE2d 160) (2008), and that like Darby, Francis was told that he needed to sign off on the Miranda waiver if he wanted to speak with the agent. In Darby, the defendant spontaneously made a statement after invoking his right to counsel, and the officers replied, "[I]f you want to tell us your side of the story you can – you know, you can sign off on a waiver and tell us your side of the story. . . ." Id. Darby then indicated that he did want to make a statement and executed a written waiver of his rights. Id. We held this was in error because "a suspect can always make a spontaneous, voluntary statement which would be admissible at trial." Id. at 272. We explained that "the correct response to Darby would have been that he could make a voluntary statement, but that he could not be interrogated by the officers, without signing the waiver." Id.

Here, unlike in Darby, Francis did not make a spontaneous statement or indicate that he wanted to do so. Instead, the agent explained that he was presenting him with his rights before proceeding with an "interview" about what had occurred earlier that morning. After confirming that Francis understood his

11

rights, the agent began questioning him. We find no error in the trial court's ruling to deny Francis' motion to suppress his custodial statement on this basis.

*B. Invocation of Right to Counsel*

Francis contends that his custodial statement was inadmissible because he was not informed that counsel had been retained and was present at the sheriff's office during his interview and he effectively invoked his right to counsel. At the Jackson-Denno hearing, it was undisputed that counsel for Francis appeared at the sheriff's office and asked the prosecutor if he could speak with Francis. The prosecutor responded that she would not inform Francis of his counsel's presence or interfere with the investigation. The attorney waited with Francis' family and made other law enforcement personnel at the office aware of his presence, but he was never allowed to meet with Francis. Although the agent interviewing Francis testified that he took several breaks and conferred with other individuals at the sheriff's office, he did not recall ever being advised that the attorney was there or wanted to speak with Francis.

After a break in the interrogation, the agent confirmed with Francis that he remembered his rights. When the agent asked Francis if he still wanted to speak with him, Francis replied that he did not know, to which the agent then

stated that it was up to Francis.  Francis responded, "I can't afford an attorney, so."  The agent then said, "Sir, all I can tell you is you . . . you understand your rights, right?"  Francis responded that he did understand his rights, and when the agent asked Francis if he wanted to continue to talk with him, Francis said, "Yes, sir. Go ahead."

Francis argues that his attorney's presence at the sheriff's office combined with his equivocal statement that he could not afford an attorney were sufficient to invoke his right to counsel.

> A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation. If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. Invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.

13

Willis v. State, 287 Ga. 703, 704 (2) (699 SE2d 1) (2010) (citations and punctuation omitted). We find that Francis' reference to an attorney was ambiguous and equivocal. After Francis made his statement about not being able to afford an attorney, the agent clarified that Francis understood his rights, which included the right to have counsel appointed if he could not afford an attorney. Francis acknowledged that he understood his rights and unequivocally affirmed that he wanted to continue the interview.

Additionally, counsel could not invoke Francis' right to an attorney for him. "'The rights guaranteed under the Fifth and Sixth Amendments are personal and must be invoked or waived by the individual defendant.'" Bell, 280 Ga. at 565. Without having consulted Francis, and acting on his own, the attorney here was "'not empowered to invoke'" Francis' personal right to counsel. Id.; see also Potter v. State, 283 Ga. 576, 577 (2) (662 SE2d 128) (2008). Moreover, events occurring outside of Francis' presence, which were entirely unknown to him, have no bearing on Francis' capacity to waive his rights. See Moran v. Burbine, 475 U. S. 412 (II) (A) (106 SCt 1135, 89 LE2d 410) (1986). Although it likely would have been useful to Francis to know that an attorney retained for him was present at the sheriff's office, police are not

14

required to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Id. at 422.

Thus, Francis has not shown that his equivocal statement about not being able to afford an attorney or his attorney's presence at the sheriff's office, either when viewed separately or in combination, invoked his right to counsel. Accordingly, we conclude that the trial court did not err in denying Francis' motion to suppress his custodial statement.

4. Francis asserts that he received ineffective assistance of counsel because his counsel failed to (1) argue Darby, which was issued after the Jackson-Denno hearing but before his trial, in support of his motion to suppress; and (2) realize that Francis could not hear all of the trial proceedings or make accommodations for him. To establish ineffective assistance of counsel, a defendant must show that his trial counsel's performance was professionally deficient and that but for such deficient performance there is a reasonable probability that the result of the trial would have been different. Strickland v. Washington, 466 U. S. 668, 695 (104 SCt 2052, 80 LE2d 674) (1984); Wesley v. State, 286 Ga. 355 (3) (689 SE2d 280) (2010). To prove deficient performance, one must show that his attorney "performed at trial in an

objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." Romer v. State, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). If the defendant fails to satisfy either the "deficient performance" or the "prejudice" prong of the Strickland test, this Court is not required to examine the other. See Green v. State, 291 Ga. 579 (2) (731 SE2d 359) (2012).

With regard to counsel's failure to argue Darby, we have found that Darby is distinguishable from this case. Therefore, counsel's failure to make a meritless objection based on Darby does not amount to deficient performance and there is no reasonable probability that the outcome of the proceeding would have been different. See Durden v. State, 293 Ga. 89, 97 (6) (a) (744 SE2d 9) (2013) ("failure to make a meritless motion or objection cannot constitute ineffective assistance of counsel").

As for Francis' hearing loss, the evidence presented at the motion for new trial hearing showed that he suffered from a significant hearing loss beginning in 2013, several years after his trial. Additionally, both of Francis' trial attorneys testified that they were unaware of Francis' hearing problem, and even Francis acknowledged that he never told his attorneys he had difficulty hearing

16

the proceedings. Moreover, the trial court found that Francis' testimony was not credible based on its observations during the new trial hearing.

"'[W]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.'" Handley v. State, 289 Ga. 786, 787 (2) (716 SE2d 176) (2011). We find no error in the trial court's credibility determinations here, and conclude that Francis' counsel did not perform deficiently. See Tyner v. State, 313 Ga. App. 557 (6) (d) (722 SE2d 177) (2012) (in rejecting ineffective assistance of counsel claim, trial court did not err by crediting counsel's testimony that the defendant had never mentioned her mental health condition over the defendant's testimony that she had informed her counsel of this).

Judgment affirmed. All the Justices concur.