**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 23, 2015**

# In the Court of Appeals of Georgia

A14A1949. LUCAS v. THE STATE.

MCMILLIAN, Judge.

On March 31, 2010, Santonio Demonta Lucas and his co-defendants, Superiore Emonte Allen and Brandon Jaron Norwood, were indicted by a Clayton County grand jury for multiple counts of malice murder, felony murder, aggravated assault, armed robbery, criminal attempt to purchase marijuana, criminal attempt to commit armed robbery, and weapons charges arising from the January 18, 2009 shooting deaths of Vandit Patel and Jimmy Prak. Allen and Norwood were convicted of felony murder and other charges stemming from their direct participation in fatally shooting both victims. The jury convicted Lucas of both criminal attempt counts, but acquitted him of all remaining counts. Lucas was sentenced to a total of 30 years, to serve 10.

Viewed in the light most favorable to the verdict,[1] the evidence shows that Lucas, Allen, and Norwood had known each other for years and were members of a rap group. They frequently met at the apartment of their mutual friend, Matthew Fallings. A few days before the shootings, the three men contacted friends asking to borrow a gun. The day before the murders, Lucas and Norwood met with Ricky Martin at Fallings' apartment to borrow his gun, a Hi-Point .45 handgun. Because he "didn't trust" Norwood, Martin gave the gun to Lucas. Allen, meanwhile, told other mutual friends of plans to rob a drug dealer to get "pounds of weed."

On the morning of the murders, twelve-year-old L. W. was walking to his aunt's apartment at Tara Court Apartments when he passed "two Hispanic guys" walking near the corner of the building and "one black guy" walking behind them. The black male was wearing a black jacket and jeans and had "dreads" that were pulled back in a ponytail. When L. W. reached the front door of his aunt's apartment one minute later, he heard multiple gunshots. L. W. was later shown a photographic lineup and identified Lucas as the man he saw following the victims. Other residents who lived in the apartment complex overlooking the crime scene testified that they

[1] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

looked outside their windows after hearing a commotion and saw two Hispanic men running from two black males.

According to one witness, Garfield Campbell, all four men ran around the apartment building at one point and then right back into the parking lot. It appeared to him that the victims were attempting to get inside a black Acura, but every time Allen and Norwood got near the Acura, the victims ran away. The taller black male, later shown to be Allen, attacked one of the victims in the parking lot and shot him twice.[2] Campbell saw Allen continue to punch and kick the victim while demanding, "give it up, give it up." The other black male, later identified as Norwood, was fighting the second victim in the pine needles at the wood line. Allen walked over to that area, shot Prak in the head and then returned to Patel.[3] Norwood then "ran over to the [Acura] and started trying to get into the car." Allen continued beating Patel, trying to get information out of him and when he did not cooperate, Allen shot Patel again several times. Both Allen and Norwood then attempted to get inside the Acura, but eventually gave up and ran toward a different section of the apartment complex. A large quantity of what police believed looked and smelled like marijuana was later

---

[2] Campbell placed a call to 911.

[3] Another witness saw one of the men go through one of the victim's pockets.

found in the trunk of Patel's car. The substance was packaged inside ten large, individually wrapped clear plastic bags which were located inside a large, blue duffel bag.

Responding officers immediately began canvassing the surrounding area, and one officer found two men walking about six hundred yards from the shooting about five to ten minutes after the shooting occurred. One of the men was Lucas, who was wearing a black leather jacket and blue jeans and had his dread locks pulled to the back of his head in a large ponytail. The officer stopped Lucas and the other man, Tacari Brown, at the intersection of Tara Boulevard and Flint Trail. Although it was a Sunday morning, Lucas claimed he was on the way to a temp agency at Southlake Mall. As the officer was speaking with Lucas, two other males, wearing all black, exited an alley behind a gas station next door. Another officer spoke with those two men, who were identified as Norwood and Keith Allen, Allen's brother. Lucas denied knowing either Norwood or Keith Allen. Campbell was brought to where they were being detained but was unable to identify any of the men, and officers let them leave.

Fallings' girlfriend testified at trial and stated that she lived with Fallings in 2009, and on the day of the shootings, she was returning from an errand when she drove past Lucas and the others as they were being detained by police near where she

4

lived. Within 15 minutes, Lucas, Norwood, and Brown showed up at her apartment. She heard Norwood say "the drugs [are] still in the black Acura." And Fallings testified that Lucas admitted that he had acted as a lookout. Martin, the owner of the gun, received a message from Fallings that morning and immediately went to his apartment where he saw both Lucas and Norwood. Martin demanded his gun back, but Norwood refused, saying that two people were dead and "It's hot right now." Martin yelled at Lucas for giving Norwood his gun. Allen came to Fallings' apartment later and admitted he had shot both victims using Martin's gun.

At trial, Lucas was convicted of criminal attempt to commit armed robbery and criminal attempt to purchase marijuana. He now appeals the denial of his motion for new trial, asserting that the trial court erred in denying his motion to suppress certain statements he made to the police and in denying his motion for directed verdict on Count 16, criminal attempt to commit the crime of violation of the Georgia Controlled Substances Act. Finding no error, we affirm.

1. Lucas first asserts that certain statements he made to the police should have been suppressed. "Whether a defendant waives his rights under *Miranda* and makes a voluntary and knowing statement depends on the totality of the circumstances. In ruling on the admissibility of an in-custody statement, a trial court must determine

5

whether a preponderance of the evidence demonstrates the statement was made freely and voluntarily." (Citation and punctuation omitted.) *Francis v. State*, 296 Ga. 190, 194 (3) (766 SE2d 52) (2014). Upon review, we accept the trial court's factual findings and credibility determinations relating to the admissibility of the defendant's statement unless clearly erroneous. Id. And when the controlling facts discernible from a videotape are not disputed, we review de novo. Id. Lucas argues that his statements to police should have been suppressed on two separate grounds, and we will address each in turn.

(a) Lucas first claims that during his February 26, 2009 statement to police, he unequivocally and unambiguously invoked his right to remain silent when he stated, "I don't want to hear no more. Take me to jail." During the *Jackson-Denno*[4] hearing, Detective Munoz, who participated in the interview, admitted that Lucas made that statement, but explained that she did not consider Lucas to be invoking his right to remain silent. Lucas maintains that anything he said from that point on should have been suppressed.[5]

---

[4] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[5] At trial, Detective Munoz testified that Lucas admitted that he spent the night before the murders at Allen's apartment in the Tara Court Apartments and that "he was the look-out for the police. And if he saw the police, he was told to make a

6

"An arrested person has the constitutional right to remain silent, but he must clearly assert his desire to remain silent to exercise that right. Police must honor an arrested person's right to remain silent if the person clearly and unambiguously states that he wants to end questioning." (Citations omitted.) *Ridley v. State*, 290 Ga. 798, 802 (4) (725 SE2d 223) (2012). However, as the State urges us to find in this case, "if a defendant equivocates in asserting the right, a police officer is under no obligation to clarify or to stop questioning." Id. In *Ridley*, the Supreme Court found that the following exchange was not an unequivocal invocation of the right to remain silent:

Ridley: I'm upset because I'm getting locked up. You take me on to jail.

Detective: No, just listen to me.

Ridley: I don't want to – no – no nothing. Take me on to jail.

Detective: We have a certain way we had to do it, okay? Do you mind if I just go ahead and do my job?

Ridley: Yeah.

---

noise." She further testified that during the interview Lucas said "he heard some shots, ran to the incident location and then saw a dead body, and then he ran." The recording of the interview was not played for the jury.

Detective: Why?

Ridley: Because you can take me on to jail.

Detective: Well, we will.

Ridley: And let me try to doggone try to talk to somebody about this – all this mess I'm in.

Detective: Well, that's what we are talking about now, but I'm going to tell you right now yelling ain't going to make it, okay? The easiest thing would be – would be just to chill[.]

Id. at 801. And in another similar case, the Supreme Court found the appellant's statement "'if y'all are going to try to do me like that, I don't want to talk no more'" was only "an equivocal invocation of his right to remain silent." *Turner v. State*, 287 Ga. 793, 795 (3) (700 SE2d 386) (2010).

The State argues that Lucas's statement was not clear and unequivocal, particularly when viewed in its proper context. During the interview, one of the detectives insisted Lucas knew about the marijuana, and Lucas responded, "If you want to say that, then say that. I don't want to hear no more. If you want to take me to jail, take me to jail." However, Lucas continued speaking to the detectives, denying

8

his role even as one detective left the room, saying, "See you in court." In response, the remaining detective confronted Lucas with the photographic lineup used to identify him. Lucas dismissed it, asking "why didn't you put [Allen and Norwood] in there if I'm with them . . . People look like me." Lucas continued, "I'm not even trying to hear that. . . . I don't want to hear no more. It was not me. . . . You can bring Thrasher to take me to jail. If it's gonna be like that. Please do. . . . I'm telling you here."

The detective then left, and Officer Thrasher entered the room. Lucas agreed that he had known Thrasher a "long time." Thrasher told him that he was hanging out with the wrong people. When Lucas agreed, Thrasher told him that the detectives were "trying to help" and "trying to get the truth." Thrasher then stated, "I don't believe that you killed anybody. . . . I believe that you were there because you hang out with the wrong people. . . . Once you go down to jail it's too late. . . . The story's over." And it was then that Lucas confessed.

Based on the record, we agree with the State that Lucas did not clearly and unequivocally invoke his right to remain silent. See *Turner*, 287 Ga. at 795 (3). (interrogating officers had no obligation to stop questioning defendant when invocation of his right to remain silent was equivocal); *Ridley*, 290 Ga. at 802 (4).

9

(b) Lucas also maintains that his confession was induced by the hope of benefit. To be admissible, a confession "must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." Former OCGA § 24-3-50.[6] Lucas points to Detective Munoz's statements to him that he needed to "beat" his co-defendant's statement, in which Allen claimed that Lucas was the shooter. He also claims that detectives repeatedly asked him, "which would be better, five years to do two or 60 years?" and that when he asked "how do I prove it," Munoz told him he needed to say that Allen was the shooter and that by making the confession he would only get five years for armed robbery and serve two.

At the *Jackson-Denno* hearing, Detective Munoz denied promising anything to Lucas and claimed that she simply urged him to tell the truth. On appeal, the State argues that no hope of benefit can be shown because at no point did detectives tell Lucas that he would be charged with a crime less than murder or that he would receive a lesser punishment if he confessed. The State instead characterizes the detectives' statements as simply informing Lucas of the seriousness of the situation and that, if he was not the shooter, he should tell the truth.

---

[6] Former OCGA § 24-3-50 is carried forward at OCGA § 24-8-824 in our new Evidence Code.

10

The record does not support Lucas' allegations. During the interview, the detectives told Lucas there was evidence that he was one of the shooters and made statements such as "I'm only trying to help you because if you didn't pull the trigger and you just happened to be with the people who acted a fool, there's a big difference." And some time later, when Lucas admitted, "I may know something about it," the detectives told him he needed to save himself, "it's 60 years you're going to be doing in jail . . . By the time you get out, you'll be 81 . . . Save yourself. . . . If you have information that you're withholding, you need to say it." The detectives continued,

> There's killers in this and there's victims of circumstance. . . . I would rather hear from you as a person that we are already looking at and we've got proof. . . . I was there. I didn't kill nobody. These [guys] went off on their own. . . . I took off and ran. . . . When a jury hears that, when a judge hears that, hell, when we hear that . . . What would be better, going to jail for murder or party to crime [on] armed robbery? Five years, do two [or] sixty years, no chance out?

One of the detectives also cautioned Lucas, "At the end of the day, God only knows what the court system or the DA might turn around [and say] . . . give him probation, he is now a witness." And with respect to Lucas's assertion that detectives told him exactly what to say, the record shows that when Lucas asked detectives, "So

11

what do I need to do then?" both detectives immediately responded, "You need to tell the truth. Say what you know."

Our review of the record persuades us that the officers' comments regarding punishment amounted to an explanation of the seriousness of Lucas' situation and admonitions to tell the truth. See *Preston v. State*, 282 Ga. 210, 212 (2) (647 SE2d 260) (2007) ("Admonitions to tell the truth will not invalidate a confession.") (citation and punctuation omitted). See also *Valentine v. State*, 289 Ga. App. 60, 62 (2) (656 SE2d 208) (2007) (even if officers' statements offered hope of a lighter sentence, their subsequent statements dispelled that hope by stating that defendant would have to work out a sentence with the DA). Under these circumstances, the trial court's denial of Lucas's motion to suppress was not clearly erroneous.

Moreover, we find that, even if the trial court improperly admitted Lucas' statement to officers admitting he acted as a lookout, the statement was cumulative of Fallings' testimony that Lucas told him he had acted as the lookout. Because the evidence was overwhelming, any error in the statement's introduction at trial was harmless. See *Phillips v. State*, 285 Ga. 213, 216-217 (2) (675 SE2d 1) (2009) (even if defendant's statement to detective was improperly admitted at trial, error was harmless in light of the fact that defendant's statement was cumulative of other

12

admissible testimony); *Frazier v. State*, 278 Ga. 297, 298 (4) (602 SE2d 588) (2004) (because defendant's custodial statement merely repeated what he had earlier told other witnesses, admission was harmless even if officers failed to honor his right to remain silent).

2. In his second enumeration of error, Lucas contends that the trial court erred in denying his motion for directed verdict on Count 16, criminal attempt to commit the crime of violation of the Georgia Controlled Substances Act. We review a trial court's refusal to grant a motion for directed verdict under the standard espoused in *Jackson v. Virginia*, 443 U.S. at 307, to determine if the evidence, when viewed in the light most favorable to the prosecution, supports the verdict. See *Lewis v. State*, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014).

"Attempt to commit a crime occurs when a person, with intent to commit a specific crime, performs any act which constitutes a substantial step toward that crime. It is not necessary that the underlying crime actually be completed." (Footnotes omitted.) *Davis v. State*, 281 Ga. App. 855, 859 (2) (637 SE2d 431) (2006) (citing OCGA § 16-4-1). The evidence summarized above shows Lucas, who procured a weapon and acted as a lookout, was a party to the group's plan to rob a drug dealer. Lucas's conduct before, during and after the shooting, along with his co-defendant's

13

attempts to enter the Acura, sufficiently constitutes a substantial step sufficient to convict him of attempting to possess marijuana as a party to the crime. See, e.g., *Massey v. State*, 267 Ga. App. 482, 484 (600 SE2d 437) (2004) (defendant's actions, including calling a known drug dealer and driving to the location to make a transaction, were sufficient to constitute a substantial step under *Jackson v. Virginia* to convict him of attempting to possess cocaine); *Drake v. State*, 266 Ga. App. 463, 465 (1) (597 SE2d 543) (2004) (defendant's conduct before, during and after the armed robbery supported the finding that he intentionally aided and abetted in the armed robbery of the victim).

Nonetheless, Lucas argues that the State did not prove that the substance found in the trunk of the Acura was actually marijuana. At trial, photographs of the substance found in the trunk were introduced, and an investigating officer was allowed to testify that the substance was marijuana. Lucas claims that the State failed to lay a sufficient foundation that the officer was qualified to identify marijuana. However, whether the State proved the substance was "real" marijuana is of no consequence. "[Lucas] is mistaken in his belief that, in order to prove attempt, the State must also prove all elements of the underlying crime." *Davis*, 281 Ga. App. at 859 (2), n. 11 (recognizing that "it would eviscerate the purpose of delineating

14

attempt as an offense if the State were required to prove all elements of the underlying crime"). See also *Watson v. State*, 256 Ga. App. 789, 790 (2) (570 SE2d 30) (2002) (the fact that substance sold to defendant was not actually cocaine does not relieve him of culpability for attempting to traffic cocaine where there was no evidence he was aware the substance was not cocaine), reversed on other grounds by *Watson v. State*, 276 Ga. 212 (576 SE2d 897) (2003); *Durfee v. State*, 221 Ga. App. 211, 212 (2) (471 SE2d 32) (1996) (rejecting defendant's argument that because the informant supplied her with "sham" cocaine, the evidence of attempted trafficking was insufficient).

Lucas and his co-defendants told friends of their plan to get "pounds of weed." And during the incident, Allen and Norwood were "focused" on the black Acura and tried to gain access to the car even after the victims were shot. Officers testified that the car smelled strongly of marijuana. A ledger, showing completed drug transactions, was found in one of the victim's pockets. The evidence was sufficient to show that Lucas was a participant in the attempted possession of what he and his co-defendants clearly believed was marijuana concealed somewhere in the black Acura and, thus, was sufficient to convict Lucas as a party to the offense charged.

15

*Judgment affirmed. Ellington, P. J., concurs. Phipps, C. J., concurs in Divisions 1 (b) and 2, and concurs in judgment only as to Division 1 (a).*