**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0046
Stephan Blake Dickey
v.
The State

On Appeal from the Superior Court of Fannin County
No. 2019-R-13

Decided: May 5, 2026

ELLINGTON, Justice.

Stephan Blake Dickey appeals his convictions for malice murder and other crimes in connection with the shooting death of Justin McKinney and the non-fatal shooting of Anna Franklin.[1]

---

[1] The crimes occurred on December 4, 2018. On February 21, 2019, a Fannin County grand jury indicted Dickey, Hunter Nicholas Hill, Dalton Levi Manuel, Kevin Jack Chamaty, and Michael Chase Havard for malice murder, felony murder, criminal attempt to commit malice murder, criminal attempt to commit armed robbery, five counts of aggravated assault, one count of aggravated battery, two counts of home invasion in the first degree, and one count each of burglary in the first degree and violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, OCGA § 16-14-4 (c). Dickey, Hill, and Manuel were also charged with possession of a firearm during the commission of a felony, and Chamaty and Havard were charged with the offense of tampering with evidence. Hill was tried separately and was convicted of malice murder and other crimes, and we affirmed his convictions on appeal. See *Hill v. State*, 322 Ga. 700 (2025). Manuel, Chamaty, and Havard entered guilty pleas. Id. at 700 n.1.

After a jury trial that ended on May 5, 2022, Dickey was found guilty on all counts. On May 12, 2022, Dickey was sentenced to serve life in prison

Dickey contends that the trial court erred in denying his motion to suppress his confession. For the reasons explained below, we affirm.

As summarized below, the evidence presented at trial showed that Dickey joined co-indictee Hunter Nicholas Hill and several other friends in planning to rob and murder both McKinney and McKinney's longtime girlfriend, Franklin, and that Dickey went with the others to the victims' house, where he shot and killed McKinney, and co-indictee Dalton Levi Manuel shot Franklin. Dickey later confessed to shooting McKinney. Hill and Manuel did not testify at Dickey's trial, but two co-indictees, Kevin Jack Chamaty and Michael Chase Havard, and another friend, Lakota Ricky Cloer, gave detailed testimony about the plan and each person's role in carrying out that plan. Franklin testified that Dickey and Hill were present during the shooting.

Before midnight on the evening of December 3, 2018, the six friends discussed a plan to rob and kill McKinney and Franklin, and four of them decided to carry out the plan. Chamaty and Havard did not go to the victims' house and went to a local Walmart instead. Cloer drove Dickey, Hill, and Manuel—who were 15 years old at the time—to the victims' house. Cloer testi-

for malice murder, consecutive prison terms of 20 years for attempted murder and five years for the firearms count, and concurrent prison terms of 30 years for attempted armed robbery, 20 years for each home invasion count, and 20 years for the RICO count. The felony murder count was vacated by operation of law, and the remaining counts were merged into the crimes for which Dickey was sentenced. Dickey filed a timely motion for new trial, which he amended on January 22, 2025. The trial court denied Dickey's amended motion for new trial on February 6, 2025. Dickey filed a timely notice of appeal, and the case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

2

fied that, when he dropped his three passengers off near the victims' house, they each carried a firearm. McKinney let them inside the house, and they joined the victims in the living room. As McKinney bent over a woodstove, Dickey shot him in the back of the head with a .410-caliber shotgun, causing McKinney's death almost instantly. Manuel shot Franklin in the face and arm with a .25-caliber pistol—Manuel later admitted as much to investigators—and the three perpetrators fled.

In the meantime, Cloer's car ran out of gas. Cloer called Chamaty and Havard to bring him some fuel, and the three of them eventually picked up Hill, Dickey, and Manuel. Manuel told Havard and Chamaty that Dickey had shot McKinney in the back of the head with the shotgun and that Manuel had then shot Franklin. Manuel hid the shotgun under his mattress, and Cloer, Chamaty, and Havard threw the .25-caliber pistol into a nearby lake. Investigators later recovered a .410-caliber shotgun from under Manuel's mattress and matched it to a shell casing recovered from the victims' house. And a .25-caliber pistol recovered from the lake matched .25-caliber shell casings found at the crime scene.

Franklin survived the shooting, called 911 at 12:54 a.m., and reported, and later testified at trial, that Hill and Dickey—both of whom she knew—were present at the shooting. Just before being airlifted to a hospital, Franklin again identified Dickey and Hill as having been in her house at the time of the shooting. Later that day, investigators went to Dickey and Hill's high school and transported them to the sheriff's office. After being advised of his *Miranda* rights, Dickey was questioned by GBI Special Agent Jamie Abercrombie and ultimately admitted that he shot McKinney with a .410-caliber shotgun. Testing of samples collected from

Dickey's hands and sweatshirt pursuant to a search warrant revealed the presence of gunshot residue.

Before trial, Dickey filed a motion to suppress his confession, and after a hearing, the trial court entered a written order denying the motion. Dickey now contends that the trial court failed to make findings sufficient to enable appellate review or, alternatively, erred in concluding that he knowingly and voluntarily waived his rights pursuant to *Miranda v. Arizona*, 384 US 436 (1966). As discussed in our recent opinion affirming Hill's convictions on appeal, *Hill v. State*, 322 Ga. 700, 702–03 (2025), the waiver inquiry has two distinct requirements: first, the "waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and, second, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 US 370, 382–83 (2010) (quotation marks omitted). "[T]rial courts are to use a totality-of-the-circumstances test to determine whether a juvenile knowingly and voluntarily waived his constitutional rights." *Clark v. State*, 315 Ga. 423, 429 (2023). That "test requires trial courts to consider all of the relevant circumstances surrounding a juvenile's interview with law enforcement officials to determine whether the State has met its burden of showing" that the juvenile knowingly and voluntarily waived his constitutional rights. Id. at 437. See also id. at 429, 434–35 & n.16 (stating that "any prescriptive or fixed list of factors by its very nature risks undermining a totality-of-the-circumstances test" and disapproving any language in prior cases indicating that a specific nine-factor framework to determine whether a juvenile knowingly and voluntarily waived his *Miranda* rights is required or exclusive).

4

When reviewing whether a defendant knowingly and voluntarily waived his *Miranda* rights, we generally "review a trial court's factual findings and credibility determinations for clear error and apply the law de novo." *Sinkfield v. State*, 318 Ga. 531, 540 (2024). "We have previously explained that when reviewing a trial court's ruling on a suppression issue, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *State v. Franklin*, 318 Ga. 39, 39 (2024) (quotation marks omitted). "In cases where some or all of the material facts are undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact." *State v. Tripp*, 320 Ga. 536, 547–48 (2024). "Such undisputed facts include, among other things, those which definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility. Audio or video evidence may match that description." *Quintanar v. State*, 322 Ga. 61, 65–66 (2025) (quotation marks omitted). "Finally, we review de novo the application of the facts to the law — that is, the trial court's ultimate conclusion whether, under all the circumstances, the defendant's statement was voluntary." Id. at 66 (quotation marks omitted).

1. Dickey first argues that the trial court failed to articulate any circumstances or make any findings of fact to support its conclusion, making it impossible for this Court to conduct a de novo review of the application of the law to the facts. Dickey therefore asks us to vacate the judgment and remand this case for proper factual findings and further consideration of the motion to suppress. The trial court entered an order denying Dickey's motion to suppress "under the totality of the circumstances." "After considering all the arguments and evidence in its entirety," the

5

court stated that it was applying relevant factors set forth in case law and found that "the interview of [Dickey] was freely and voluntarily given[.]" Although the court expressed some concern "as to how this interview was conducted," it acknowledged that "the admissibility of statements by juveniles depends on whether, under the totality of the circumstances, there was a knowing and intelligent waiver of constitutional rights" and that "[t]he burden is on the State to demonstrate that the juvenile understood and waived those rights." At trial, before opening statements, Dickey asked the trial court to reconsider its ruling, but the court reaffirmed its prior ruling denying the motion to suppress and "perfect[ed] the record" by specifically finding "from a preponderance of the evidence the defendant was advised of each of his *Miranda* rights, that he understood them, that he voluntarily waived them, and that he thereafter gave his statement freely and voluntarily."

Dickey provides no authority for his request to remand this case and bases it solely on the trial court's lack of specific factual findings. Although the trial court mentioned case law setting forth some relevant factors and did not list those factors or expressly acknowledge other factors that may have been pertinent to its analysis of the totality of the circumstances, "we generally do not require trial courts to make specific, on-the-record findings about each aspect of the totality of the circumstances they evaluate or to make explicit factual findings or credibility determinations on the record." *Clark*, 315 Ga. at 439–40. Here, the trial court did not indicate that any factors were required or exclusive. The trial court's order shows its consideration of the totality of the circumstances and is not lacking simply because it did not also expound upon the factors relevant to that consideration. See id. at 440 ("In sum, we see no indication that the trial court failed to apply a totality-of-the-circumstances test in determining whether

6

Clark knowingly and voluntarily waived his rights under *Miranda*. Clark's claim therefore fails."). Accordingly, we reject Dickey's request to remand this case.

2. Dickey alternatively argues that the circumstances shown by the evidence at the hearing on his motion to suppress do not support the conclusion that he voluntarily waived his *Miranda* rights. In his initial appellate brief, Dickey relies on several circumstances that were substantially identical to the circumstances surrounding Hill's waiver of his *Miranda* rights, which we subsequently set forth in our decision affirming Hill's convictions. In his appellate reply brief, Dickey acknowledges our intervening decision in Hill's case, which rejected Hill's contention that he did not knowingly and voluntarily waive his *Miranda* rights. Dickey distinguishes that decision solely on the basis that Hill, unlike Dickey, "never asked to speak with an attorney or a parent at any point" and "was not denied ... bathroom access." *Hill*, 322 Ga. at 705. The parties have not raised any dispute about the words or the conduct occurring in the recorded interview of Dickey or about any other evidence related to the interview.

Agent Abercrombie's testimony at the hearing on the motion to suppress, together with a video recording of Dickey's custodial interview, shows the following.[2] On the day of the shooting, after obtaining arrest warrants for Dickey and Hill, Agent Abercrombie and another GBI Special Agent went to the high school.

---

[2] We have also reviewed Agent Abercrombie's testimony at trial for the light it sheds on the evidence related to Dickey's interview because, in determining the admissibility of a defendant's statement, the appellate court may consider all of the evidence, whether adduced at the pre-trial hearing or at trial. See *Boles v. State*, 316 Ga. 209, 220 (2023); *Francis v. State*, 296 Ga. 190, 194–95 (2014).

Agent Abercrombie told Dickey that she wanted to talk with him about McKinney, and Dickey agreed to go with her to the sheriff's office. Dickey rode to the sheriff's office in the front seat of a different vehicle from Hill, was handcuffed during the drive for security reasons, and was not informed of his arrest warrant or that he was under arrest. Agent Abercrombie refrained from telling Dickey he was under arrest because she wanted him to feel comfortable talking with her at that early stage of the investigation.

At the sheriff's office, Dickey was placed in a room separate from Hill, and Dickey's handcuffs were removed. The door to the interview room remained unlocked. Dickey was placed in the interview room at approximately 12:34 p.m., and the interview began around 12:37 p.m. Agent Abercrombie first read Dickey his *Miranda* rights verbatim from a GBI card, asking Dickey whether he understood each right. Dickey affirmed that he understood each right as it was read to him. The GBI did not have a separate *Miranda* warning for juveniles at that time. Agent Abercrombie then asked Dickey if he was "okay with sitting down and talking with [her] for a little bit today." Dickey then agreed to speak with Agent Abercrombie.

Dickey was 13 days shy of his 16th birthday and in tenth grade when he was interviewed. Dickey did not appear to be under the influence of any drugs or alcohol, or suffering from any mental disability or mental illness at the time of the interview. Dickey appeared to understand what Agent Abercrombie was saying and the questions she was asking, and he answered the questions appropriately. Although Agent Abercrombie was not aware at the time that Dickey had ADHD or was on a corresponding individualized education plan, she testified that he clearly understood the information she was conveying, that he was responding

8

appropriately, and that there was no indication that a mental disability was impacting his comprehension. Dickey never asked to stop the interview or speak with an attorney. Dickey was not threatened, physically harmed, coerced, or promised anything in exchange for his statements.

Agent Abercrombie explained that she employed the GBI-recommended "Reid technique." Agent Abercrombie initially asked Dickey open-ended, nonconfrontational questions and later interrogated him with accusatory and confrontational questions. About 45 minutes into the initial portion of the interview, and about ten minutes before that portion ended, Agent Abercrombie asked Dickey if there was any reason his fingerprints or DNA would be at the crime scene, and he gave a negative answer. After concluding the initial portion of the interview, Agent Abercrombie took a ten-minute break, leaving Dickey alone in the interview room. During that break, Dickey stuck his fingers in his mouth, spit on some toilet paper that was in the interview room, wiped off his hands with it, attempted to clean under his fingernails, and rubbed his shoes together.

After observing this behavior, Agent Abercrombie received help from another officer to apply for a search warrant and returned to the interview room to begin the confrontational portion of her questioning. About six minutes into that part of the interview, Dickey asked to go to the restroom, which Agent Abercrombie testified that she did not allow at that time because she was trying to preserve the evidence that might be on Dickey's person and could be washed away if he went to the restroom. About 13 minutes later, soon after Dickey confessed to shooting McKinney and as the second portion of the interview was ending, Dickey asked a second time to use the restroom. Agent Abercrombie said she would get someone to walk there with him in a minute and,

9

less than a minute later, Dickey was escorted from the interview room to the restroom. Although Agent Abercrombie was unsure if Dickey truly needed to relieve himself and the search warrant had not yet been obtained, she allowed him to go to the restroom with a male investigator who was instructed not to let Dickey wash his hands. Agent Abercrombie admitted that she could have done that at any time, but she testified that the reason she had not allowed Dickey to go to the restroom with an investigator after Dickey's first request was that she hoped to obtain the search warrant quickly and having him wait for a short time was not detrimental to his wellbeing.

After returning to the interview room, Dickey fell asleep, and Agent Abercrombie returned about 25 minutes later and asked more questions for about five minutes. Dickey was then left alone in the interview room and was handcuffed about 50 minutes later. After nearly another hour, during which time the search warrant was issued, Agent Abercrombie brought Dickey's mother into the interview room for a few minutes. After another ten minutes, Agent Abercrombie and other officers swabbed Dickey's hands, collected his shoes and sweatshirt, and answered questions from Dickey. After Agent Abercrombie subsequently returned and took DNA swabs, Dickey asked to use the restroom again. After using the restroom again, he left the interview room four and a half hours after the interview had begun.

Prior to the interview, law enforcement had tried unsuccessfully to contact Dickey's father – who was a convicted felon on probation – and did not know the identity of Dickey's mother at that time. During the interview, Agent Abercrombie learned that Dickey was living with Hill's father, but law enforcement was unable to contact him. Although Dickey asked just before the first

break if his mother had been contacted, Agent Abercrombie testified that she did not stop the interview and try to contact Dickey's mother because Dickey's mother did not have to be present and Dickey was not living with her. At some point, however, Dickey's mother was contacted, came to the sheriff's office, and was permitted to speak with her son in the interview room. Dickey then asked what was going to happen, and his mother said something about him going to "YDC." Agent Abercrombie told Dickey, "You're being arrested." Dickey responded, "Well, dur."

The trial court did not err by determining that Dickey voluntarily and knowingly waived his *Miranda* rights. See *Hill*, 322 Ga. at 703–07. The two distinctions that Dickey draws between his and Hill's circumstances are, upon close examination, distinctions without a difference. First, although Dickey argues that he asked for his mother, there is no evidence that he asked to speak with his mother. Dickey asked only if his mother had been contacted, and he did not request that she be present during the interview. See *Hill*, 322 Ga. at 705 (holding that the trial court did not err in determining that Hill knowingly and voluntarily waived his *Miranda* rights under very similar circumstances, including the fact that Hill never asked to speak with a parent). The absence of Dickey's mother was relevant to the trial court's consideration of the totality of the circumstances, but was not determinative of the voluntariness of his *Miranda* waiver. See *Love v. State*, 309 Ga. 833, 838 (2020) (holding that the absence of the appellant's mother was "not determinative on the issue of voluntariness" of his *Miranda* waiver); *Heard v. State*, 287 Ga. 554, 557 (2010) (holding that the absence of the appellant's mother "was a factor for the trial court to consider, but it was not determinative on the issue of voluntariness" of his *Miranda* waiver). Second, the recording of Dickey's interview shows that his bathroom break

11

was only postponed for less than 15 minutes after his initial request, and Agent Abercrombie had a sound reason for not immediately granting that initial request. Such a short, reasonable postponement of the restroom break that Dickey requested, without any indication of resulting distress or discomfort, does not amount to evidence that his *Miranda* waiver was the product of "intimidation, coercion, or deception" rather than "a free and deliberate choice." See *Berghuis*, 560 US at 382–83. Considering all the circumstances here, including Agent Abercrombie's testimony and the video recording, we conclude that the trial court did not err in denying Dickey's motion to suppress.

*Judgment affirmed. All the Justices concur, except Warren, P. J., not participating.*